[Civ. No. 1078.    Third Appellate District.—March 7, 1913.]

# MARTHA E. SHIRRAN, Respondent, v. ROBERT DAL-LAS et al., Defendants and Respondents; JOHN DALLAS, Intervener and Appellant.

JUDGMENT—COLLATERAL ATTACK—DETERMINATION OF VALIDITY OF JUDG-MENT.—In a collateral attack upon a judgment, the question whether the judgment is or is not void must be determined by an inspection of the judgment-roll.

ID.—JUDGMENT-ROLL—WHAT CONSTITUTES.—The judgment-roll, where the complaint has not been answered, consists of the summons, proof of service, the complaint upon which is indorsed a memorandum that the default of the defendant in not answering has been entered, a copy of the judgment, and in case the service so made is by pub-lication, the affidavit for publication of summons, and the order directing the publication.

ID.—PRESUMPTION IN FAVOR OF VALIDITY OF JUDGMENT.—Every pre-sumption is in favor of the validity of the judgment, and any con-dition of facts consistent with the validity of the judgment will be presumed to have existed, rather than one which will defeat the judg-ment.

ID.—FAILURE OF RETURN OF SUMMONS TO SHOW COMPLAINT HAS BEEN SERVED.—The failure of the return of summons to show that a copy of the complaint was served with the summons discloses a mere ir-regularity which does not render the judgment void or subject to collateral attack.

ID.—COST-BILL—FAILURE OF JUDGMENT-ROLL TO SHOW SERVICE AND FIL-ING.—The fact that the judgment-roll does not show that the cost-bill was properly served and filed does not render the judgment open to collateral attack. The cost-bill is no part of the judgment-roll, and it is to be conclusively presumed, in support of the judgment, that all the requirements of the statute which are necessary to the authority of the court to allow costs were duly and regularly ob-served.

ID.—JUDGMENT FOR AN AMOUNT ABOVE THAT DECLARED ON IN COM-PLAINT.—The same presumption is to be indulged with respect to the matter of an alleged excess in the sum awarded by the judg-ment over that declared upon in the complaint. The court having acquired jurisdiction of the subject matter of the action and of the defendant, it likewise acquired jurisdiction to render judgment in the action; and, if thus it awarded to the plaintiffs more than their complaint showed that they claimed or were entitled to, the

judgment for that reason is merely erroneous, correctible only on appeal therefrom.

ID.—EXECUTION FOR AMOUNT IN EXCESS OF JUDGMENT.—An execution is not void because it calls for more money than is awarded by the judgment; the variance amounts only to an irregularity, and the execution may be amended. The rule is not different where the judgment was entered on the default of the defendant.

ID.—TITLE CONVEYED BY SHERIFF'S DEED—IMPEACHMENT.—If no proceeding is resorted to at the proper time to have the execution amended so as to conform to the amount awarded by the judgment, the variance cannot, in a collateral way, be sustained as in impeachment of the title established and conveyed by the sheriff's deed.

ID.—COLLATERAL ATTACK—WHEN NOT AVAILABLE.—Where a judgment does not appear upon the face of the judgment-roll to have been *coram non judice,* or where an erroneous execution thereupon issued is amendable, both the judgment and the execution must, when collaterally assailed, be treated as valid in all respects.

ID.—EXECUTION RETURN AND CERTIFICATE BY "UNDER SHERIFF."—The return of an execution and the sheriff's certificate of sale are not invalid because purporting to have been executed by the sheriff by and through an "under sheriff."

ID.—UNDER SHERIFF—JUDICIAL KNOWLEDGE.—It is a matter of such common knowledge that the courts may take notice of the fact that in this state, from almost the beginning of the state government, one of the deputies in the office of sheriff of each of the counties has always been known and designated, if not by the law by the sheriff himself, as an "under sheriff," generally meaning the chief deputy.

ID.—DEFINITION OF TERM "UNDER SHERIFF."—The phrase "under sheriff" means a deputy of a sheriff; it is merely another name for "deputy sheriff," and the two phrases describe the same officer.

ID.—DEFECTS IN SHERIFF'S RETURN—EFFECT ON PURCHASER'S TITLE.— Although the sheriff's return and certificate of sale do not disclose that the levy was made according to law, this cannot be urged in derogation of the purchaser's title. The validity of the title to property conveyed by a sheriff's deed at an execution sale is not dependent upon the sheriff's return; the title is not created by the return, but is derived from the previous sale.

ID.—DEFAULT JUDGMENT—MANNER OF FILING.—A judgment by default need not be filed otherwise than as prescribed by section 670 of the Code of Civil Procedure. The clerk does all that the law requires when he attaches together the summons upon which is indorsed the written admission of service thereof by the defendant, the complaint, the clerk's entry of default, a copy of the judgment by de-

fault entered by the clerk, and a certificate of the clerk to the judgment-roll; and files the judgment-roll.

ID.—EXECUTION SALE—SHERIFF'S RETURN—PARTNERSHIP.—The title of purchasers at an execution sale is not invalidated because the sheriff's return shows a sale to a partnership composed of such purchasers. The title does not depend for its validity upon the return of the sheriff.

ID.—SHERIFF'S DEED TO PARTNERSHIP—LEGAL EFFECT.—The legal effect of a sheriff's deed to a partnership is to convey the land to the partners as individuals, holding the legal title thereto as tenants in common.

ID.—JUDGMENT LIEN—PROPERTY SUBJECT TO—REMAINDER.—Where a deed conveys real estate to the grantee for life with reversion at her death to the grantor, or his heirs or devisees, such heirs, upon the death of the grantor intestate, have a vested remainder in the property which is subject to the lien of a judgment and to sale under execution.

ID.—DECREE OF DISTRIBUTION—EXECUTION PURCHASER—RECITALS AS TO TITLE.—A finding in the decree of distribution of the grantor's estate that the purchaser under execution of the interest of one of the heirs has not yet acquired the legal title to such interest and is not entitled to have it distributed to him, is not an adjudication that he has acquired no rights that may not ripen into a legal title, the period of redemption from the execution sale not having yet expired, and the probate court having no authority to distribute to an execution purchaser.

APPEAL from an interlocutory decree in partition of the Superior Court of Stanislaus County and from an order refusing a new trial. L. W. Fulkerth, Judge.

The facts are stated in the opinion of the court.

C. W. Eastin, for Intervener and Appellant.

Maddux & Maddux, for Plaintiff and Respondent.

L. W. Jefferson, for Defendants and Respondents.

HART, J.—This is an action for the partition of the lands described in the complaint. The court found that the property affected by its decree was so situated that partition thereof could not be had without "great prejudice" to the owners of the same, and, accordingly, decreed a sale thereof

by a referee appointed by the court for that purpose, such sale or sales to be subject to the confirmation of the court and the proceeds thereof to be paid by said referee into court "to abide the further order of this court."

The intervener, John Dallas, appeals from the interlocutory decree so entered and from the order denying his motion for a new trial.

The facts of the several transactions which are pertinently connected with this litigation are not controverted and are correctly stated in the brief of the respondent as follows:

"On the 9th day of April, 1873, Charles Dallas was the owner of the land in controversy, and was a single person, and had the following children by a deceased wife, to wit: John Dallas, Robert Dallas, Mary Hickman, Belle Keep, Sierra Nevada Dallas, Mrs. Jefferson, and William Dallas— these were his only heirs and were all of age. On that day, in contemplation of marriage with Mrs. Ellen Sturge, he executed a deed of this same land, conveying to 'Ellen Sturge for and during her natural life, with the reversion at her death to the said party of the first part, or to his heirs or devisees.' That he married Ellen Sturge, on the 9th day of April, 1873. On the 13th day of August, 1883, he died intestate. At the time of his death the same children were living, and were his only heirs as to the land in controversy. He had no children by the second wife. When the estate was distributed, December 27th, 1887, these same children were all alive. On the 11th day of March, 1887, the said John Dallas was indebted to J. M. Shafe and C. A. Post, partners doing business under the firm name and style of Shafe & Post, on a promissory note dated January 6th, 1887, for $2,263.63, with interest thereon at the rate of one per cent per month, both principal and interest aggregating on said day, $2,312.66. On the 11th day of March, 1887, said Shafe & Post brought suit against said John Dallas in the superior court of the county of Stanislaus; that summons was duly issued on said day and served March 11th, 1887, on the defendant, John Dallas, intervener and appellant herein; that the summons was filed in said court March 15th, 1887, and the admission of service was written on said summons, and signed by the said defendant; that on March 22nd, 1887, there being no appearance by the defendant, judgment by

default was rendered and entered by the clerk against the defendant, John Dallas, for the sum of $2,320.22, and for $6.10 costs; that this admission of the service of summons was signed by the defendant, John Dallas; that the clerk, on August 24th, 1887, issued execution for the sum of $2,395.07 with interest thereon from the date of judgment at seven per cent, and said execution was duly levied ᴏn said land, on August 25th, 1887; that the sheriff of said county advertised said land for sale on the 24th day of September, 1887, and on that day sold the same to Shafe & Post for $2,451.60; that there were no other Shafe & Post in the county of Stanislaus, except J. M. Shafe and C. A. Post, doing business under the .firm name and style of Shafe & Post, and they are and were the plaintiffs in that action; that a certificate of sale was on said day issued by the sheriff to the said Shafe & Post, and the same was recorded on said day in the recorder's office of the county of Stanislaus; that on the 19th day of October, 1887, Ellen C. Dallas, the administratrix of the estate of Charles Dallas, filed in the superior court of the county of San Joaquin a petition for the distribution of the estate of Charles Dallas; that the hearing of the same was fixed for the 17th day of November, 1887; that the decree of distribution was made on the 27th day of December, 1887. On the 29th day of October, 1887, said Shafe & Post filed in the superior court a request that the one-seventh interest of John Dallas be distributed to them under the certificate of sale, and that the court denied said request. On April 28th, 1888, R. B. Purvis, as sheriff of Stanislaus County, pursuant to said sale, conveyed said land to said J. M. Shafe and C. A. Post, which deed was on May 5th, 1888, recorded in the recorder's office of the county of Stanislaus; that on May 5th, 1888, said C. A. Post conveyed his interest in said land to said J. M. Shafe, which deed was recorded in the recorder's office of Stanislaus County on the 26th day of September, 1903; that on the 5th day of May, 1888, the said J. M. Shafe conveyed the whole of said land to the plaintiff herein, which deed was on the 26th day of September, 1903 recorded in the recorder's office of Stanislaus County." Ellen C. Dallas, widow of Charles Dallas, died on the eleventh day of November, 1906.

It will be observed that the plaintiff's title to the lands in dispute is derived from the sheriff's deed, executed and delivered upon the sale of said lands under the execution issued upon the judgment rendered and entered in the case of Shafe & Post *v.* John Dallas. The principal objections urged against the plaintiff's title involve a collateral attack upon said judgment, and they arise upon the rulings of the court upon the evidence and the order denying the intervener's motion for a nonsuit at the close of the case for the plaintiff. It is also claimed that there are fatal defects in the sheriff's certificate of sale, and, furthermore, that, at the time of the purported levy of the execution on the lands in dispute, the intervener had no interest in said lands which was subject to execution or a lien of any character which would or could inure to the benefit of a judgment creditor. The points thus generally referred to and which are urged in impeachment of said judgment and of plaintiff's title to the land in dispute may be specifically stated as follows: 1. That there was not a legal service of summons; 2. That the judgment made an illegal allowance in favor of the plaintiffs in said action for costs, the specific ground of objection in that regard being that no cost-bill was legally served and filed; 3. That the judgment in said action was never filed; 4. That the default judgment was entered for a sum in excess of that mentioned in the summons and as prayed for by the complaint; 5. That the certificate of sale and return of execution were not legally executed, the claim in this connection being that said certificate and return purport to have been made by the sheriff *by* an "under sheriff," and that there was at the time of the transaction, no such an officer as an "under sheriff"; 6. That the execution was not levied; 7. That there is a fatal variance between the allegations of the complaint in the present action and the proof, in that the complaint herein alleges that in the former action judgment was rendered and entered in favor of J. M. Shafe and C. A. Post, as individuals, whereas the judgment-roll in said action shows that judgment was rendered and entered in favor of Shafe & Post, as partners; that the complaint in this action alleges that the sale by the sheriff was made to J. M. Shafe and C. A. Post, as individuals, while the sheriff's return of sale shows that the sale was to "Shafe & Post," as partners, etc.; 8. That the sheriff's

deed was not properly or legally recorded; and 9. That, at the time of the entry of judgment in the case of Shafe & Post *v.* John Dallas, the last named had no interest in the land upon which a judgment could become a lien, or upon which an execution could be levied.

As stated, most, if not all, of these objections involve a collateral attack upon the judgment in the case of Shafe & Post *v.* John Dallas. The settled rule is that, in a collateral attack upon a judgment, the question whether such judgment is or is not void must be determined by an inspection of the judgment-roll, which, in a case where, as here, the complaint has not been answered, consists of the summons, proof of service, the complaint upon which is indorsed a memorandum that the default of the defendant in not answering has been entered, and a copy of the judgment, "and in case the service so made is by publication, the affidavit for publication of summons, and the order directing the publication of summons." (Code Civ. Proc., sec. 670, sub. 1.) In other words, "every presumption is in favor of the validity of the judgment, and any condition of facts consistent with the validity of the judgment will be presumed to have existed, rather than one which will defeat the judgment." (*Canadian etc. Co.* v. *Clarita etc. Co.,* 140 Cal. 674, [74 Pac. 302] ; *In re Eichoff,* 101 Cal. 605, [36 Pac. 11] ; *Eichoff* v. *Eichoff,* 107 Cal. 42 [48 Am. St. Rep. 110, 40 Pac. 24].)

In the case of Shafe & Post *v.* Dallas, the defendant indorsed on the summons in writing the following admission: "I hereby acknowledge and admit that the within summons was duly and legally served on me at the county of Stanislaus, state of California, this 11th day of March, A. D. 1887. (Signed) John Dallas." Section 415 of the Code of Civil Procedure provides that proof of the service of summons and complaint, may, among other modes, be by "the written admission of the defendant." It is contended, however, that it cannot be told from an inspection of the judgment-roll whether there was proof of the genuineness of the signature of the defendant to the admission of service of summons, nor whether a copy of the complaint was served with the summons. (Code Civ. Proc., sec. 410.) The answer to this proposition is that the judgment itself recites that the defendant, John Dallas, was "regularly served with process," and that from such re-

cital the presumption follows that there existed every fact and act essential to the giving of the court jurisdiction of the person of Dallas.

The rule uniformly adopted by the authorities was stated and applied in the early case of *Alderson* v. *Bell,* 9 Cal. 315, 321, the facts of which, so far as the point under consideration is concerned, were precisely the same as those in the case at bar. There, as here, the defendants, over what purported to be their signatures, acknowledged service of process by the indorsement thereof in writing upon the complaint. There, as here, the claim was that such admission of service was insufficient to give the court jurisdiction of the persons of the defendants because of the absence of proof of the signatures of the defendants, and a designation of the place where the service was made. While holding that "when the proof of service of process consists of the written admission of the defendants, such admission, to be available in the action, should be accompanied with some evidence of the genuineness of the signatures of the defendants," the court nevertheless said: "The decree recites that the defendants had been regularly served with process, or had waived service by their acknowledgment. This is sufficient evidence that the requisite proof was produced to establish the genuineness of the signatures of the defendants to their admission. Even if there were no such recitals in the decree, and there was an entire absence of evidence in the record on the point, still the presumption should be in favor of the jurisdiction of the court, and of the regularity of the proceedings; and for the want of such evidence, the decree cannot be impeached in this collateral action" (citing *Cook* v. *Darling,* 18 Pick. (Mass.) 393; *Crane* v. *Brannan,* 3 Cal. 182.) (See, also, *Hahn* v. *Kelley,* 34 Cal. 391, [94 Am. Dec. 742]; *Peck* v. *Strauss,* 33 Cal. 658; *Sharp* v. *Daugney,* 33 Cal. 514.)

In the case of *Drake* v. *Duvenick,* 45 Cal. 455, it is held that the failure of the return of summons to show that a copy of the complaint had been served with the summons discloses a mere irregularity which does not render the judgment void or subject to collateral attack.

What has already been said applies with equal pertinency and force to the assault upon the judgment in question because of the alleged illegal allowance of costs and the asserted

excess in the amount awarded by said judgment over the amount sued for. As to the matter of costs, it is to be added that the cost-bill is no part of the judgment-roll, and it is to be conclusively presumed, in support of the judgment, that all the requirements of the statute which are necessary to the giving the court authority to allow costs were duly and regularly observed. The same presumption is to be indulged with respect to the matter of the alleged excess in the sum awarded by the judgment over that declared upon in the complaint, conceding that such a variance in fact exists. In other words, the court having acquired jurisdiction of the subject matter of the action and of the defendant, it likewise acquired jurisdiction to render judgment in the action, and if thus it awarded to the plaintiffs more than their complaint showed that they claimed or were entitled to, the judgment for that reason is merely erroneous, correctible only on appeal therefrom. (1 Freeman on Judgments, sec. 135, and authorities cited in the foot-notes at page 252.)

It is further contended that the execution issued on the judgment was void because it called for more money than was awarded to the plaintiffs by said judgment. Conceding that the suggested disparity between the judgment and the execution existed, still the variance amounted to a mere irregularity which did not render the execution absolutely void. The rule is that an execution which may be amended is not void, and it has been held that an execution which calls for too much money is amendable. (*Hunt* v. *Loucks*, 38 Cal. 372, [99 Am. Dec. 404].) Therefore, the execution concerned in this case, if erroneous in the particular indicated, could have been amended on motion or through some appropriate proceeding, so that the amount it called for would have conformed to the amount awarded by the judgment; but, no such proceeding having been resorted to at the proper time, the variance, if variance there was, cannot, in this collateral way, be sustained as in impeachment of the title established and conveyed by the sheriff's deed. (1 Freeman on Executions, sec. 43; *Hunt* v. *Loucks*, 38 Cal. 372, [99 Am. Dec. 404]; *Doehla* v. *Phillips*, 151 Cal. 496, [91 Pac. 330].) Nor is the rule as thus proclaimed any the less applicable in a case where, as here, the judgment upon which the execution has been issued was entered upon

the default of the defendant. In this case the defendant, as seen, was duly and regularly served with process, expressly admitted such service and defaulted. He knew the consequences which would follow such default. Merely because he had failed to answer the complaint did not release him from the duty, incumbent upon him, to see that the judgment did not allow a greater amount than the court was authorized to award under the allegations of the complaint or that the execution did not call for a greater sum of money than the judgment called for. If, therefore, either of these things occurred, it was his duty to have known that the error existed and have seen that it was corrected at the proper time. The rule as to collateral attacks upon judgments or executions thereupon issued is founded on the soundest considerations of public policy. The arbitrary ripping up in collateral proceedings of judgments or executions, which are immune from direct attack by reason of the lapse of time, would obviously be productive of very mischievous consequences; hence, the very sensible rule before referred to, that where a judgment does not appear upon the face of the judgment-roll to have been *coram non judice,* or where an erroneous execution thereupon issued is amendable, requires that both such judgment and such execution must, when collaterally assailed, be treated as absolutely valid in all respects.

The authorities cited by counsel for appellant in support of his position on the questions discussed in the foregoing are not in point. They are cases in which a direct attack was made upon the judgment, and, therefore, deal with situations entirely different from that presented here.

The claim that the return of execution and the sheriff's certificate of sale are void for the asserted reason that they do not appear upon their face to have been executed by the sheriff is untenable. This point grows out of the fact that said return and certificate purport to have been executed by the sheriff by and through an ''under'' sheriff, the contention being that at the time of the purported sheriff's sale there was no such an officer known to our law as an ''under sheriff.'' It is not deemed necessary, in order to decide the present point, to ascertain whether, at the time of the purchase of the property in dispute at the sheriff's sale by

Shafe & Post, there was or was not an officer, connected with
the office of sheriff, technically designated by the statute as
an "under sheriff," for it is a matter of such common knowl-
edge that the courts may take notice of the fact that, in this
state, from almost the beginning of the state government,
one of the deputies in the office of sheriff of each of the
counties has always been known and designated—if not by
the law by the sheriff himself—as an "under sheriff," gen-
erally meaning the chief deputy. Moreover, the phrase,
"under sheriff," bears a distinct and definite legal significa-
tion. It is defined by Bouvier's Dictionary, vol. 2, p. 611,
as "a *deputy* of a sheriff." In "Words and Phrases," etc.,
vol. 3, p. 2009, we find this: "Deputy sheriffs are of two
kinds: 1. A general deputy, *or* under sheriff, who, by virtue
of his appointment, has authority to execute all the ordinary
duties of the office of sheriff . . . " Thus it clearly ap-
pears that an "under sheriff" is merely another name for
a "deputy sheriff," and that the two phrases describe pre-
cisely the same officer. It follows that the execution of the
return and the certificate of sale referred to in this case by
the sheriff by or through a person designating himself upon
those documents as an "under sheriff" was sufficient to show
that the official acts essential to their validity were those of
the sheriff through a deputy duly and regularly authorized
to act in said transactions for him and in his name.

The contention that there was not a legal levy upon the
property in dispute cannot be supported. The sheriff's re-
turn and certificate of sale clearly disclose that the levy was
made according to the requirements of the law, but even if
this were not true, still the point cannot be urged in deroga-
tion of the title acquired by the purchaser at the sheriff's
sale of the property under the execution. The rule in this
state is and has been from a very early date that the validity
of the title to property conveyed by a sheriff's deed at an
execution sale is not dependent upon the sheriff's return.
"That title was not created by the return, but was derived
from the previous sale made by the sheriff by virtue of his
writ. The sale and the sheriff's deed are sufficient evidence
of the title, and if the purchaser can show that the sheriff
had authority to sell it is enough, and he need look no fur-
ther." (*Ritter* v. *Scannell*, 11 Cal. 248, [70 Am. Dec. 775],

citing *Jackson* v. *Sternbergh,* 1 John. Cas. (N. Y.) 153; *Blood* v. *Light,* 38 Cal. 649, [99 Am. Dec. 441] ; *Porter* v. *Pico,* 53 Cal. 172; *Hibberd* v. *Smith,* 67 Cal. 564, [56 Am. Rep. 726, 4 Pac. 473, 8 Pac. 46] ; *McFall* v. *Buckeye etc. Association,* 121 Cal. 471; *Weldon* v. *Rogers,* 157 Cal. 413, [108 Pac. 266] ; 2 Freeman on Executions, sec. 274.) In *Blood* v. *Light,* 38 Cal. 649, [99 Am. Dec. 441], it is said: ''The performance of the acts described in the statute as a levying of the execution is material only in reference to the intervening rights of third persons who are not parties to the writ. It is, undoubtedly, the duty of the officer to proceed strictly according to the statute, and if he does not do so, the sale may be set aside, upon motion, or he may be made to respond in damages to any one who has been injured by his neglect; but it would be gross injustice to hold that by proof of such neglect, made, perhaps, years after the sale, the purchasers' title shall be defeated.''

The point that the judgment is void for the alleged reason that it was not ''filed'' by the clerk is without merit. Section 585, subdivision 1, of the Code of Civil Procedure, at the time of the entry of the judgment in controversy, provided, as it now provides, as follows: ''In an action arising upon contract for the recovery of money or damages only, if no answer has been filed with the clerk of the court within the time specified in the summons, or such further time as may have been granted, the clerk, upon application of the plaintiff, must enter the default of the defendant, and immediately thereafter enter judgment for the amount demanded in the complaint, including the costs, against the defendant,'' etc. Section 670 of the same code provides: ''Immediately after entering the judgment, the clerk must attach together and file the following papers, which constitute the judgment-roll: 1. In case the complaint is not answered by any defendant, the summons, with the affidavit of proof of service; the complaint with a memorandum indorsed thereon that the default of the defendant in not answering was entered, and a copy of the judgment,'' etc. It will be observed that, with the exception that a copy of such a judgment must be attached to the other papers mentioned in section 670 and thus become a constituent part of the judgment-roll, which must be filed, neither of the sections above referred to requires that a judg-

ment by default must be filed. The record before us discloses that, in the former action, the clerk strictly followed the requirements of subdivision 1 of section 670—that is, that he attached together the summons upon which is indorsed the written admission of service thereof by the defendant, the complaint, the clerk's entry of default, a copy of the judgment by default entered by the clerk, and a certificate of the clerk to the judgment-roll, and filed the judgment-roll. This was all that the law required. The cases cited by the appellant to this point are not applicable. The Code of Civil Procedure expressly provides that, upon the *trial* of a question of fact by the court, its decision must be given in writing *and filed,*" etc. (sec. 632) and that the judgment *upon the decision* must be entered accordingly (sec. 633), and it is merely held in the cases referred to by appellant that in such case a *decision* must be *filed* as so required before judgment may be entered. But there is not to be found in those cases a single word which furnishes the slightest reason for supposing that it was intended that a judgment *by default* must be filed, otherwise than as prescribed by section 670, as above explained.

We have discovered no variance between the allegations of the complaint in the present action and the proofs, nor any between the allegations of the plaintiff's answer to the appellant's complaint in intervention and the evidence. One of the contentions under this assignment is that the complaint alleges that "in the case of J. M. Shafe and C. A. Post *v.* John Dallas, judgment was made and entered for the sum of $2366.63 and interest," whereas the judgment so made and entered was "in favor of the partnership and not in favor of two individuals." But counsel for some reason seems to have overlooked in its entirety the averment to which he refers. The complaint very plainly alleges that the judgment in question was rendered and entered in favor of Shafe and Post, *as partners.* In that particular it reads: " . . . in the case of J. M. Shafe and C. A. Post, *partners doing business under the name and style of* Shafe & Post *v.* John Dallas, judgment was made and entered for the sum of $2366.63 and interest in favor of said J. M. Shafe and C. A. Post, partners doing business under the name and style of Shafe & Post,'' etc.

21 Cal. App.—27

It is next contended that the complaint and the proof vary because the former alleges that the lands were sold to "J. M. Shafe and C. A. Post," whereas the sheriff's return of sale and the receipt of the plaintiff's attorney show that the sale was made to "Shafe & Post," a partnership. As to this last point, it is first to be observed that, as before shown, the plaintiff's title does not rest for its validity upon the return of the sheriff on the execution. The deed recites that "J. M. Shafe and C. A. Post" were the purchasers at said sale and the grantees, and, so far as the parties to the transaction themselves are concerned, the return or other acts of the sheriff after the judgment and antecedently to the sale are practically *functus officio*. Secondly, a partnership is not a person, either natural or artificial, and, therefore, cannot at law be the grantee in a deed or hold real estate, and even if the deed, following the return, had conveyed the lands to "Shafe & Post," as partners, the legal effect of the instrument would have been to convey said lands to them as individuals, holding the legal title thereto as tenants in common. (*Adams* v. *Church*, 42 Or. 270, [95 Am. St. Rep. 742, 59 L. R. A. 782, 70 Pac. 1037]; *Cole* v. *Mette*, 65 Ark. 503, [67 Am. St. Rep. 946, 947, 47 S. W. 407]; *Harnett* v. *Stillwell*, 121 Ga. 386, [104 Am. St. Rep. 152, 49 S. E. 276]; *Walker* v. *Miller*, 139 N. C. 448, [111 Am. St. Rep. 805, 4 Ann. Cas. 602, 1 L. R. A. (N. S.) 157, 52 S. E. 125]; *Woodward* v. *McAdam*, 101 Cal. 440, 441, [35 Pac. 1016].) There are other alleged variances suggested by counsel, but these call for no special notice. We have found no variance between the averments of the answer to the appellant's complaint in intervention and the evidence.

There are several other points urged against the decision of the trial court, but the only one of those which appears to demand special consideration in this opinion is involved in the proposition earnestly contended for by counsel, that at the time of the entry of the judgment in the case of Shafe & Post v. John Dallas, the latter had no interest in the land in dispute upon which a judgment could become a lien or upon which execution could be levied.

It will not, of course, be questioned that if, at the time of the docketing of the judgment in favor of Shafe & Post against John Dallas, the latter had a vested interest in the

lands in dispute, said judgment then became a lien upon such interest in said lands and, furthermore, that such interest was subject to attachment or execution upon a judgment against John Dallas. This proposition is settled by the law of this state and the authorities. (See Code Civ. Proc., secs. 671, 688 and 541; Freeman on Executions, sec. 178 and cases cited in the foot-notes; *Fish* v. *Fowlie,* 58 Cal. 375; *Barnett* v. *Barnett,* 104 Cal. 298, 301, [37 Pac. 1049].)

The *habendum* clause of the deed from Charles Dallas to Ellen Sturge reads as follows: "To have and to hold all and singular the said premises unto the said party of the second part for and during her natural life with a reversion at her death to the said party of the first part or to his heirs or devisees." Then follows a provision whereby each of the parties relinquishes all right to succession to the separate property of the other. From the foregoing provisions of the indenture these propositions are clearly and unmistakably deducible: 1. That the grantor intended to and did vest in the grantee a life estate only in the property described, at the same time expressly pretermitting her as an heir or cutting off her right to succeed as an heir to any of his estate; 2. That he intended that, in case the grantee's death should ante-date his, the whole estate in the lands should return to him; 3. That, although the word "reversion" in lieu of the word "remainder" is used in connection therewith, in the event that he died, intestate, prior to the termination of the life tenancy, the fee in the property should go to and vest in his heirs.

It is, however, argued that, if the language of the deed above quoted means anything or has any force at all, so far as the fee in the property is involved, the interest thereby granted to John Dallas was not to vest until the death of the life tenant. But we are unable to take that view of the grant. It is true that the deed provided for a contingency, the happening of which would have defeated the right of the heirs to take any estate thereunder. This contingency lay in the right reserved by the grantor to devise the property or dispose of it by testament, and it is undoubtedly true that, during the lifetime of the grantor, whatever interest the deed contemplated that the heirs should take thereunder was contingent in the strictest sense, since by the terms of the grant there was uncertainty as to which of the two classes of re-

maindermen—the devisees or the heirs—would take the fee.
But it is equally true that the moment the grantor died intestate, the interests of the heirs became vested remainders.
It is as if A granted an estate to B for life with a remainder
in fee to the heirs of C, then living.   This would be a contingent remainder, because whether the remainder so created
would become vested would obviously depend upon the death
of C before the termination of the life estate.   *Nemo est
haeres viventis.*   But immediately upon the death of C during
the existence of the life tenancy the remainder would become
vested.   In the present case, as stated, the death of Charles
Dallas without having disposed of the property by will or
testament operated, *eo instanti,* to destroy the contingency,
the happening of which would alone have prevented the remainders to his heirs from becoming vested estates in the
lands.   In other words, the grantor having died intestate,
there was then no intervening contingency the happening of
which could deprive the heirs of the right "to the immediate
possession of the property upon the ceasing of the intermediate estate."   (Civ. Code, sec. 694.)   Of course, the
right to the actual enjoyment of possession was postponed to
an uncertain time—that is, until the termination of the intermediate or life estate—but "it is the uncertainty of the
*right* of enjoyment, and not the uncertainty of the *actual*
enjoyment, that renders the remainder contingent."   (4
Kent's Commentaries, 202, 206.)   "When the person to
whom the remainder, after a life estate is limited, is ascertained, and the event upon which it is to take effect is certain to happen, it is a vested remainder, although, by its
terms, it may be entirely defeated by the death of such person before the determination of the particular estate.   It is
the present *capacity* of taking effect in possession, if the possession were to become vacant, and not the certainty that the
possession will become vacant before the estate limited in
remainder determines, that distinguishes a vested from a contingent remainder."   (*Estate of Fair,* 132 Cal. 578, [84 Am.
St. Rep. 70, 60 Pac. 449], and authorities cited.)

In the case at bar, we find the existence in ascertained
persons (the heirs or children of Charles Dallas) of a present
fixed right of future enjoyment.   In other words, we can
here "point to a person who, if the life estate should cease,

would, *eo instanti et ipso facto,* have an immediate right to possession, and this is a vested remainder, and, by necessary consequence, all the contingencies which may operate to defeat the right of possession are to operate, and only to operate, as conditions subsequent.'' (*Moore* v. *Littel,* 41 N. Y. 80; *In re De Vries,* 17 Cal. App. 184, 202, [119 Pac. 109]; *Estate of Washburn,* 11 Cal. App. 735, [106 Pac. 415].)

The evidence shows, as we have seen, and the court finds that Charles Dallas died in San Joaquin County in the month of August, 1883, and that his estate was probated in said county, he having left property therein as well as the lands involved here, situated in Stanislaus County. Said estate was under administration at the time of the entry of the judgment against John Dallas and which is concerned in this suit. The heirs of Charles Dallas consisted of six children and upon his death, he having left no will or testament whereby the property in dispute was disposed of, the remainder in fee in said property immediately passed to and vested in said children as the heirs of the grantor. Therefore, by virtue of the law of this state, the lien of the judgment, upon the entry thereof, immediately attached to the future interest of John Dallas so acquired.

But it appears that, on the twenty-ninth day of October, 1887, while the estate of Charles Dallas was yet in process of administration, Shafe & Post petitioned the court in probate to distribute to them the share or interest of John Dallas in the property in dispute; that thereafter, and on the twenty-seventh day of December, 1887, the superior court in and for the county of San Joaquin, before which the administration of said estate was had, made and entered its final decree of distribution of said estate; that by said decree, said court denied the petition of Shafe & Post above mentioned in the following language: "That Shafe & Post, under and by virtue of their judicial sales and purchases thereunder, have not yet acquired a legal title to the distributive shares or any part thereof of William Dallas or John Dallas to the lands remaining of said estate of Charles Dallas, deceased, and are not entitled to have the said interests or shares or any part thereof distributed to them.'' Upon this finding by the superior court, sitting in probate in the matter of said estate, the appellant bases the contention that thereby the claim of

Shafe & Post to the title to said property was adjudicated against them, that such adjudication is conclusive as to the title and that Shafe & Post are "estopped from litigating this title afterward with intervener."

There are two answers to that proposition: 1. That, at the time of the sale and the issuance of the certificate thereof by the sheriff to Shafe & Post—September 24, 1887—the law gave John Dallas the right to redeem the property from such sale within six months thereafter. (See Newmark's Code Civ. Proc., (ed. 1889,) sec. 702.) Therefore, Shafe & Post were not entitled to a deed until the twenty-fifth day of March, 1888. It necessarily follows that, the final decree of distribution having been made and entered on the twenty-seventh day of December, 1887, a trifle over three months only from the date of the sale and the issuance of the certificate thereof, the court was without the right or jurisdiction to distribute the share of John Dallas to Shafe & Post, even if there were no other legal obstacle to interrupt and prevent the exercise of that power. 2. The law requires that the probate court shall distribute the estate to the original heirs, legatees or devisees, except in those cases where such heirs, legatees, or devisees may have *conveyed* their shares to other persons, in which case "such shares must be assigned to the person holding the same in the same manner as they otherwise would have been to such heirs, legatees, or devisees." (Code Civ. Proc., sec. 1678; *Martinovich* v. *Marsicano*, 137 Cal. 354, 357, [70 Pac. 459, 460] ; *Hardy* v. *Mayhew*, 158 Cal. 95, 103, [139 Am. St. Rep. 73, 110 Pac. 113].)

In the first mentioned of the cases just cited it is said: "In the absence of statutory authority therefor, the superior court, under its jurisdiction of 'all matters of probate,' would have no authority upon the final distribution of a decedent's estate to assign the same, or any portion thereof, to any person other than an heir, devisee or legatee. By section 1678 of the Code of Civil Procedure authority is given to it to make distribution of real estate to others than the heirs, legatees, or devisees, but its authority therefor rests solely upon the provisions of this section, and is limited by its terms. . . . Under this section the court is authorized to assign the share of an original heir or devisee to another *only* when such heir or devisee has 'conveyed' his share to such other person."

The finding in the decree of distribution concerned in the present case that Shafe & Post " . . . have not *yet* acquired a legal title to the *distributive shares or any part thereof* of William Dallas or John Dallas to the land remaining of said estate of Charles Dallas, deceased, and are not entitled to have the said interests or shares or any part thereof *distributed* to them," is, manifestly, not an adjudication that Shafe & Post had acquired no rights in said lands which might and could ripen into a legal title thereto, but merely constituted an adjudication: 1. That, by reason of the right of redemption still subsisting in John Dallas, Shafe & Post have not *yet* acquired a legal title to said lands; 2. That, by reason of an absence of statutory authority in the court to make such a distribution in any event, they were not entitled to have the interests and shares of William or John Dallas *distributed* to them. This finding was strictly true both as a matter of fact and as a matter of law. But it was not found by the court in probate that Shafe & Post did not have an inchoate right to the title, and the finding certainly could not affect in any way the title as finally perfected by the sheriff's deed.

The appellant presents some assignments of error in the rulings of the court in receiving certain evidence. These objections involve, practically, some of the points which have already been considered and decided adversely to the contentions of the appellant. They do not, therefore, require special notice. The record appears to be free from prejudicial error, and the judgment and the order appealed from are, therefore, affirmed.

Chipman, P. J., and Burnett, J. concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 3, 1913, and the following opinion then rendered thereon:

THE COURT.—The petition for a rehearing of this cause in the supreme court is denied.

We base this action upon the proposition that upon the face of the record of the judgment in the case of Shafe &

Post *v.* Dallas, mentioned in the opinion of the district court of appeal, there was sufficient evidence of the service of the summons on Dallas to give the clerk *prima facie* authority to enter the default and judgment against him. We do not approve of that part of the opinion of the district court which appears to indicate or decide that the presumptions of jurisdiction upon a judgment thus entered by the clerk are the same as those which attend a judgment entered in pursuance of judicial action by the court. (See *Kelly* v. *Van Austin,* 17 Cal. 564; *Bond* v. *Pacheco,* 30 Cal. 533.) But as the authority of the clerk to enter the judgment appeared from the face of the record, the doctrine just stated is not essential to support the conclusion of the district court that the judgment was valid. (*Providence Tool Co.* v. *Prader,* 32 Cal. 634, [91 Am. Dec. 598.].)