# PUERTO RICO *v.* RUBERT HERMANOS, INC.

No. 582. Argued March 7, 8, 1940.—Decided March 25, 1940.

*Mr. William Cattron Rigby*, with whom *Messrs. George A. Malcolm* and *Nathan R. Margold* were on the brief, for petitioner.

*Messrs. Henri Brown* and *George M. Wolfson* for respondent.

*Mr. Melvin H. Siegel*, with whom *Solicitor General Biddle* and *Assistant Attorney General Shea* were on the brief for the United States, as *amicus curiae*, by special leave of Court, urging reversal.

Mr. Justice Frankfurter delivered the opinion of the Court.

The question here in controversy is a matter of great importance to Puerto Rico and involves the power of its legislature to enforce Congressional policies affecting the Island. We therefore brought the case here on a writ of certiorari, to review a decision of the Circuit Court of Appeals for the First Circuit. 106 F. 2d 754. That court had reversed the judgment of the Supreme Court of Puerto Rico, 53 P. R. 779 (Spanish edition) sustaining a proceeding in *quo warranto* brought against respondent.

The proceeding was initiated in the Supreme Court of Puerto Rico under jurisdiction conferred upon it by the local legislature. The substance of two measures, enacted in 1935, and set out below, authorized the Government of Puerto Rico to bring a *quo warranto* proceeding in its Supreme Court against any corporation violating federal law.[1] Accordingly, the Attorney General of the Island

---

Act No. 33 of July 22, 1935, Laws of Puerto Rico, Special Session, 1935, p. 418, providing:

"Section 1.—There is hereby conferred upon the Supreme Court of Puerto Rico exclusive original jurisdiction to take cognizance of all *Quo Warranto* proceedings that the Government of Puerto Rico may hereafter institute for violations of the provisions of Section 752, Title 48, United States Code, and for that purpose it is provided that the violation of said provisions shall constitute sufficient cause to institute a proceeding of the nature of *Quo Warranto*.

"Section 2.—All laws or parts of laws in conflict herewith are hereby repealed.

"Section 3.—This Act, being of an urgent character, shall take effect immediately after its approval."

Act No. 47 of August 7, 1935, Laws of Puerto Rico, Special Session, 1935, pp. 530–32, providing:

"Section 1.—Section 2 of An Act entitled 'An Act establishing Quo Warranto proceedings,' approved March 1, 1902, is hereby amended as follows:

"'Section 2.—In case any person should usurp, or unlawfully hold or execute any public office or should unlawfully make use of any

brought the present suit against respondent, a corporation organized in 1927 under Puerto Rico's corporation law. The gravamen of the suit was alleged defiance by respondent of the Congressional restriction imposed upon "every corporation authorized to engage in agriculture . . . to the ownership and control of not to exceed five hundred acres of land." This restriction, according to the complaint, embodied "the public policy of the

franchise, or likewise shall hold any office in any corporation created by and existing under the laws of Puerto Rico, or any public officer shall have done or suffered any act which, by the provisions of the law, involves a forfeiture of his office, or any association or number of persons shall act within Puerto Rico as a corporation, without being legally incorporated, or any corporation does or omits any act which amounts to a surrender or forfeiture of its rights and privileges as a corporation, or exercises rights not conferred by law, the Attorney General, or any prosecuting attorney of the respective district court, either on his own initiative or at the instance of another person, may file before any district court of Puerto Rico a petition for an information in the nature of *Quo Warranto* in the name of The People of Puerto Rico; or whenever any corporation, by itself or through any other subsidiary or affiliated entity or agent, exercises rights, performs acts, or makes contracts in violation of the express provisions of the Organic Act of Puerto Rico or of any of its statutes, the Attorney General or any district attorney, either on his own initiative or at the instance of another person, may file before the Supreme Court of Puerto Rico a petition for an information in the nature of *Quo Warranto* in the name of The People of Puerto Rico; and if from the allegations such court shall be satisfied that there is probable ground for the proceeding, the court may grant the petition and order the information accordingly. Where it appears to the court that the several rights of divers parties to the same office or franchise may properly be determined on the same proceeding, the court may give leave to join all such persons in the same petition, in order to try their respective rights to such office or franchise.'

" 'When any corporation by itself or through any other subsidiary or affiliated entity or agent is unlawfully holding, under any title, real estate in Puerto Rico, the People of Puerto Rico may, at its option, through the same proceedings, institue [*sic*] in its behalf the confiscation of such property, or the alienation thereof at public auction,

People of Puerto Rico" first declared by Congress in its Joint Resolution of May 1, 1900, 31 Stat. 715, supplementing the Foraker Act of April 12, 1900, 31 Stat. 77.[2] This limitation upon the corporate ownership of land was continued when Congress in 1917 revised the constitutional framework of Puerto Rico's government in what is the existing Organic Act, § 39 of the Act of March 2, 1917, 39 Stat. 951, 964 (48 U. S. C. § 752).

The present controversy derives from the fact that Congress affixed no direct consequences to disobedience of its land policy for Puerto Rico. The main issue presented here is whether Puerto Rico's Legislative Assembly has power to graft such consequences upon the Con-

within a term of not more than six months counting from the date on which final sentence is rendered.

" 'In every case, alienation or confiscation shall be through the corresponding indemnity as established in the law of eminent domain.' "

[2] § 3 of the Joint Resolution provides:

"No corporation shall be authorized to conduct the business of buying and selling real estate or be permitted to hold or own real estate except such as may be reasonably necessary to enable it to carry out the purposes for which it was created, and every corporation hereafter authorized to engage in agriculture shall by its charter be restricted to the ownership and control of not to exceed five hundred acres of land; and this provision shall be held to prevent any member of a corporation engaged in agriculture from being in any wise interested in any other corporation engaged in agriculture. Corporations, however, may loan funds upon real estate security, and purchase real estate when necessary for the collection of loans, but they shall dispose of real estate so obtained within five years after receiving the title. Corporations not organized in Porto Rico, and doing business therein, shall be bound by the provisions of this section so far as they are applicable."

Whether the restriction operates directly as a limitation upon the powers of the corporation or merely as a limitation upon the Legislative Assembly's power to confer corporate privileges, its effect is to render corporate land ownership in excess of the prescribed acreage unlawful. See the opinion of Attorney General Wickersham, 28 Op. A. G. 258, 260–261.

gressional prohibition.- This was the issue as the Supreme Court of Puerto Rico conceived it, and we are not disposed to deal with it differently. It was suggested by the dissenting judge in the Court of Appeals that the Supreme Court's judgment may be supported by construing the 1935 legislation as a means of enforcing the local land policy—identic, to be sure, with that declared by Congress—embodied in the 1911 corporation law of Puerto Rico. To do so, however, would take us into niceties of pleading and of local law which were not canvassed by the insular court. Such a course would be peculiarly gratuitous when the issue which the local court in fact decided is easily resolved.

In the setting of the traditional relation between the broad outlines designed by Congress for the government of territories and the powers of local legislatures to move freely within those outlines, the difficulties conjured up against the view taken by the Puerto Rican court rapidly evaporate. The objections urged against it illustrate vividly the power of subtle argument to give an appearance of difficulty to what is relatively simple. The breadth of local autonomy reposed by Congress in the Legislative Assembly was elucidated too recently and too thoroughly in *Puerto Rico* v. *Shell Co.*, 302 U. S. 253, to call for repetition here. Suffice it to say that the opinion in that case underlined the fullness of scope which Congress gave to Puerto Rico when it provided by § 37 of the Organic Act of 1917 that "the legislative authority shall extend to all matters of a legislative character not locally inapplicable . . ." 39 Stat. 964, 48 U. S. C. § 821. Drawing on the practice of Congress in its treatment of territories throughout our history, and assimilating that practice into the Puerto Rican situation, the Court concluded that "The grant of legislative power in respect of local matters, contained in § 32 of the Foraker Act and continued in force by § 37 of the

548

Organic Act of 1917, is as broad and comprehensive as language could make it." 302 U. S. at 261.

Surely nothing more immediatcly touches the local concern of Puerto Rico than legislation giving effect to the Congressional restriction on corporate land holdings. This policy was born of the special needs of a congested population largely dependent upon the land for its livelihood.[3] It was enunciated as soon as Congress became responsible for the welfare of the Island's people, was retained against vigorous attempts to modify it,[4] and was reaffirmed when Congress enlarged Puerto Rico's powers of self-government. Surely Congress meant its action to have significance beyond mere empty words. To treat the absence of a specific remedy for violation of the restriction as an implied bar against local enforcement measures is to impute to Congress a dog-in-the-manger attitude bordering on disingenuousness. We refuse to believe that Congress was bent on the elaborate futility of a *brutum fulmen*. What was said in another context, *Texas & N. O. R. Co.* v. *Railway Clerks*, 281 U. S. 548, 569, is apposite here: "The definite prohibition which Congress inserted in the Act cannot therefore be overridden in the view that Congress intended it to be ignored. As the prohibition was appropriate to the aim of Congress, and is capable of enforcement, the conclusion must be that enforcement was contemplated." The suggestion that enforcement might come only through

[3] See Gayer, Homan and James, The Sugar Economy of Puerto Rico, pp. 97–132; Diffie, Porto Rico: A Broken Pledge, pp. 45–88; Fleagle, Social Problems in Porto Rico, pp. 19–27; Hanson, Planning Problems and Activities in Puerto Rico (Report to National Resources Committee, 1936). Compare Clark, etc., Porto Rico and Its Problems, pp. 495–500, 628 *et seq.*

[4] See H. R. 23,000, 61st Cong.; H. Rep. No. 750, 61st Cong., 2d Sess.; S. Rep. No. 920, 61st Cong., 3d Sess.; 45 Cong. Rec. 6861 *et seq.*, 7220 *et seq.*, 7584 *et seq.*, 7604 *et seq.*, 8177 *et seq.*; 46 Cong. Rec. 2644.

*quo warranto* proceedings by the Attorney General of the United States is equally reckless.

A much more rational explanation, consistent with the organic relation between Congress and the local government, is at hand. As the ultimate legislative guardian of the Island's welfare, Congress confined the legislature's discretion within the limits of the five hundred-acre restriction. How this policy was to be realized was for Puerto Rico to say. "Local authorities may ascertain facts and decide questions upon which depends appropriate exertion of the power much more conveniently than may the Congress." *Public Service Commission* v. *Havemeyer*, 296 U. S. 506, 515–16.

It is admitted, as indeed in view of the *Shell* case it could not be denied, that the remedy here pursued would have been available to the Legislative Assembly if that body had adopted the Congressional policy in a substantive statute of its own. But respondent contends that the same result cannot be achieved by investing the insular courts with jurisdiction directly to enforce the Congressional policy. Such useless indirection is compelled neither by the Organic Act nor by any general consideration underlying the distribution of power between Congress and the insular legislature. So long as the Legislative Assembly acts within the framework which Congress has set up it merely avails itself of the power conferred in § 37 of the Organic Act. It has done so here.

There remains for consideration an objection based on § 256 of the Judicial Code (28 U. S. C. § 371). That section vests in "the courts of the United States . . . exclusive of the courts of the several States" jurisdiction of all suits "for penalties and forfeitures incurred under the laws of the United States." Whether a law passed by Congress is a "law of the United States" depends on the meaning given to that phrase by its context. A law

for the District of Columbia, though enacted by Congress, was held to be not a "law of the United States" within the meaning of § 250 of the Judicial Code. *American Security Co.* v. *District of Columbia*, 224 U. S. 491. Likewise, we hold that § 39 of the Organic Act is not one of "the laws of the United States" within the meaning of § 256. Section 39 is peculiarly concerned with local policy calling for local enforcement from which local courts should not be excluded by a statutory provision plainly designed for the protection of policies having general application throughout the United States.

Other objections urged at the bar and in respondent's brief do not call for particular mention. On the only questions now before us, we think the Supreme Court of Puerto Rico acted within the scope of power validly conferred upon it by the Legislative Assembly.[5] The judgment of the Circuit Court of Appeals must therefore be

*Reversed.*

MR. JUSTICE McREYNOLDS did not participate in the decision of this case.

---

[5] The imposition of a fine by the Supreme Court of Puerto Rico, as a part of the power to grant relief ancillary to the main proceeding for forfeiture of the corporate privileges, was within the scope of authority validly conferred upon it by the 1935 legislation. Compare *Illinois* v. *Illinois Central R. Co.*, 33 F. 721. See High, Extraordinary Legal Remedies, §§ 745–762.