Elisa Campos Delgado et al., Plaintiffs and Appellants-Appellees, *v.* Central Cambalache, Defendant and Appellee-Appellant, and Juan González Campos, Defendant.

No. 8815. Argued January 20, 1944.—Decided July 28, 1944.

*A. Reyes Delgado, P. Santos Borges,* and *Luis Mercader* for plaintiffs and appellants-appellees. *G. Zeno Sama* and *Francisco M. Cadilla* for defendant and appellee-appellant Central Cambalache, Inc.

Mr. Justice De Jesús delivered the opinion of the court.

By deed of April 14, 1920, Fernando González Cabeza mortgaged, with the express consent of his wife Elisa Campos, several properties belonging to them in favor of Central Cambalache, Inc., to secure a loan in the amount of $25,000. He bound himself to pay the debt in annual installments of $5,000 with interest at 8 per cent per annum, the first installment to become due on July 30, 1921, and the remaining ones successively on the same day and month of each subsequent year until 1925, on which date the last of said installments should become due. It was agreed that in default of payment of two installments of the principal or two annual interest payments, the whole debt would be considered due.

By another deed of May 22, 1920, González Cabeza and his wife constituted another mortgage in favor of the same Central to secure another loan in the amount of $14,000. It was stipulated that the amount owed would be paid within the period of six years ($2,000 on May 22, 1921, and $2,400 on the same day and month of each of the years 1922 to 1926 inclusive), with legal interest at 9 per cent per annum payable on annual installments at the domicile of the creditor. It was agreed that if the debtor should fail to pay two consecutive installments of the principal and interest, the debt would be considered due.

González Cabeza died on May 31, 1923, his estate descending to his widow in the usufructuary share and to his children Juana María de los Angeles, Fernando, Juan, and José Antonio González Campos. His mother Juana Cabeza de

Madero received as legacy the usufruct of the third of free disposal, the sister of the testator, Guillermina González Cabeza, being appointed as her substitute.

On December 18, 1925, after two mortgage credits had become due and since the debtors had only paid the amount of $628.99 on their account, the Central brought an action of debt, case No. 8597, in the district court against Elisa Campos Delgado and her children wherein it prayed for a judgment in the amount of $56,574.07, with interest thereon up to the time of final payment, and costs, disbursements, and attorney's fees. In the summons issued by the clerk the following was set forth:

"And you are hereby notified that upon your failure to answer said complaint . . . the plaintiff will obtain judgment according to the prayer in the complaint."

The defendants did not appear and the clerk entered a default judgment,[1] whereupon, on August 26, 1926, the mortgaged properties were sold as a whole at a public sale and adjudicated for the amount of $56,574.07 to Oliver, Matienzo & Co., *S. en C.*, a partnership, and on September 2 following the deed of judicial sale was executed.

By deed of August 26, 1927, the children of legal age of González Cabeza and his widow, in her own behalf and as mother with *patria potestas* over her minor son José Antonio, sold to said partnership for the amount of $28,675 a sugar-cane plantation of about 200 acres (*cuerdas*) which they had on the properties sold at public auction, agricultural equipment and movable property, the purchaser retaining the amount

---

[1] The dispositive part of the judgment reads as follows:

"Therefore, having entered a default judgment against the defendants and this being a suit arising from a contract to collect money, we find it proper to enter in the record of the court judgment adjudging the defendants Elisa Campos, Juana María de los Angeles, Fernando, Juan, and José González Campos to pay to the plaintiff corporation, Central Cambalache Inc., the sum of $56,574.07 specified in the summons, which is the total amount of the two loans above referred to with their stipulated interest, *as well as the interest that may accrue at the agreed rate until full payment of the amount and the costs.*" (Italics ours.)

of $9,625.78 which the vendors owed to the Central for agricultural advances. After making the sale the following was stipulated in clause "D" of the deed:

"It is expressly agreed that Elisa Campos and her children voluntarily waive and convey any other rights which they might have on the properties belonging to Oliver, Matienzo and Co., acquired by purchase at public auction and specially the right of homestead which they may have thereon, which waiver is made in favor of Oliver, Matienzo and Co., in consideration also of the amount received by the first, according to the act approved on March twelve nineteen hundred and three."

By virtue of said deed of August 26, 1927, the widow received $3,250 as her share of the property sold and each child received $2,062.50, but since no judicial approval had been obtained of the contract as to the minor, his share was deposited in the American Colonial Bank in the name of his mother and of the District Attorney of Arecibo until said judicial approval should be procured. It was not until the execution of this deed that the widow and the children of González Cabeza delivered to the partnership the properties which had been adjudicated to them at the judicial sale.

By a deed of October 3, 1927, Guillermina González Cabeza, who had substituted her mother at her death as the usufructuary of the third of free disposal, sold to the partnership the usufruct for the amount of $500.

And lastly, by a deed of January 11, 1932, the partnership in payment of its debt to the Central, conveyed all the properties which it owned among those claimed by the plaintiffs.

Ten years later, at the end of 1941, or at the beginning of 1942,[2] Elisa Campos Delgado and her children, with the exception of Juan, who refused to join the plaintiffs and was made a party-defendant, filed an action in the lower court

---

[2] The amended complaint which appears in the record is dated February 9, 1942, and there is no showing of the date on which the original complaint was filed.

against the Central seeking the annulment of the judgment rendered in case No. 8597, for revendication, and for damages. Two causes of action are set forth in the complaint. In the first one, the properties acquired by the partnership in case No. 8597 are described. It is alleged therein that said partnership acted in behalf and for the benefit of the Central, its partners being Andrés Oliver Roses and José Matienzo Lezcano, president and vice-president of the Central Cambalache, Inc., respectively; that since the latter is an agricultural corporation, the two mortgage deeds executed in its favor were void by virtue of the prohibition contained in § 3 of the Joint Resolution approved on May 1, 1900, by the Congress of the United States, which was later incorporated in § 39 of our Organic Act; that the partnership acted as a juridical entity to facilitate the violation of said prohibition and that inasmuch as the adjudication made at the public sale in favor of the partnership was simulated, since the real purchaser of the properties was the Central and the latter could not legally acquire them, said adjudication was void; that ever since the properties were delivered to the partnership the Central has been in possession thereof, cultivating them as its own; and that the plaintiffs have requested the Central to deliver the possession of the properties, which it has refused to do.

As a second cause of action, it is alleged that since September 2, 1926, the Central has been cultivating the properties and planting therein minor crops, pasture, and cane, which it later converted into sugar and molasses, and that it has received benefit-payments from the Agricultural Adjustment Administration for the cane not planted or left uncut; that the fruits yielded by the properties amount to $125,000, after deducting expenses of cultivation, property taxes, and insurance of harvest, and that the plaintiffs have requested the Central to deliver the properties and to pay

them the amount of $125,000 as net profit, which it has refused to do. The complaint closes with the prayer for a judgment declaring:

(1) That the adjudication of the properties made at the public sale in favor of the Central, through the partnership, is nonexistent and that the deeds executed by reason of said sale are void for the following reasons: (*a*) because the Central had no legal capacity to acquire the properties when the deed of judicial sale was executed in favor of its tool, the partnership, and neither did it have it later when the partnership conveyed the properties nor has it any now; (*b*) because the judgment by virtue of which the sale at public auction was ordered is null and void inasmuch as the summon did not comply with the statutory requirements, the latter being, therefore, also null and void for which reason the clerk lacked power to enter the judgment by default; and (*c*) because the acts performed for the conveyance of plaintiffs' titles to the Central were based on the ground that the properties would be mortgaged to the Federal Land Bank of Baltimore for the benefit of plaintiffs' successor;

(2) That the Central should leave the properties to the free disposal of the plaintiffs;

(3) That the Central should pay to the plaintiffs the amount of $125,000 as net profit, with legal interest thereon at 6 per cent per annum from the date of the rendition of the judgment until fully paid; and

(4) That costs, disbursements, and attorney's fees be imposed on the defendant.

After the parties were heard, the lower court decided that the mortgages executed in favor of the Central were valid; that the title acquired by the latter when the partnership conveyed the properties to it could only be annulled by the People of Puerto Rico; and that the plaintiffs had no right to attack the title of the Central, but that the adjudication made in favor of the partnership was void, because (1) the summons was defective inasmuch as it failed to state the

obtain judgment in the event that the defendants failed to answer the complaint; (2) when entering judgment by default the clerk erroneously ordered the defendants to pay interest after maturity at the same rate agreed in the note, although in the mortgage deeds no such interest was stipulated; and (3) in the writ of execution, contrary to the agreement in the mortgage deed of $25,000 and to the pronouncement of the judgment, payment of interest, computing the same at 9 per cent per annum instead of at 8 per cent, as was stipulated in the mortgage contract, was ordered. However, the court held that by virtue of the deed of August 26, 1927, the widow and her children of age had confirmed the judicial sale which took place in case No. 8597 and consequently that they were estopped to allege the nullity thereof, but that, as to the minor, said deed did not ratify the judicial sale because it was never submitted for judicial approval. It further held that, although the minor acquired a house with the $2,062.50 which corresponded to him, which house he mortgaged later on becoming of age, such transactions did not constitute an implied ratification of the judicial sale, because the amount of $2,062.50 received by the minor was part of the proceeds of the sale of the real property already mentioned. Lastly, the lower court found that the Central had not deceived the plaintiffs herein, or prevented them, either directly or indirectly, from defending themselves.

Based on these conclusions the court rendered judgment sustaining the complaint as to the plaintiff José Antonio González Campos and dismissing the same as to the others. It ordered the Central to return to said plaintiff a condominium of one-eighth of each of the properties, said condominia being subject to the dispositions of the will of González Cabeza as to the usufruct which he bequeathed to his mother and which in her place was acquired by his sister Guillermina; and if the Central was not able to place the condominia at the disposal of said plaintiff to pay him an

equal amount in cash and upon the failure to reach an agreement, they should submit their petition of appraisal to the court. The court further ordered the Central to pay to the plaintiff one-eighth of the amount of $39,000 which had been fixed as the value of the real property conveyed by the deed of August 26, 1927, and that there should be deducted from said one-eighth the amount of $2,062.50 which was deposited in the bank at the disposal of the plaintiff by virtue of the stipulation contained in said deed. The court ordered the Central to pay to the plaintiff two-thirds of one-eighth of $95,000 which was the amount compensable as net profits of the properties since 1927 and thereafter, keeping in mind the dispositions of his father's will in regard to the usufruct of the one-third of free disposal. Finally the Central was ordered to pay to the plaintiff costs and $2,000 as attorney's fees.

The plaintiffs, with the exception of José Antonio González Campos, have appealed from that judgment. The defendant Central also appealed as to the pronouncement made in favor of José Antonio González Campos.

The questions to be decided in this appeal are as follows:

1. Could the Central obtain a valid title to the lands which belonged to González Cabeza notwithstanding the provisions of § 3 of the Joint Resolution approved May 1, 1900?

II. Assuming that the Central had acquired a valid title against González Cabeza and his predecessors, was the judicial proceeding by virtue of which the plaintiffs herein were dispossessed of their title on said properties null?

III. Assuming that said proceeding was null, was it ratified by the plaintiffs herein?

I

There existed no legal impediment when González Cabeza made the mortgage loans from the Central. Section

3 of the Joint Resolution approved on May 1, 1900,[2 a] expressly authorizes the corporations to make loans upon real estate security and purchase real estate when necessary for the collection of loans on condition that they shall dispose of the real estate so obtained within five years after receiving the title. As was properly stated by the judge of the court *a quo,* if the Central could directly acquire the properties subject to the conditions stated, it could also acquire them indirectly by using Oliver, Matienzo & Co., *S. en C.,* as its instrument. We must, therefore, reach the conclusion that under the Joint Resolution the Central acquired a valid title. It is true that counting from the date of the adjudication of the properties to the partnership—August 26, 1926—and even if we disregard that date and count from January 11, 1932, on which date the partnership conveyed them to the Central as payment, until the filing of the original complaint in the present case—at the end of 1941 or at the beginning of 1942—there had elapsed over five years, within which the Central should have disposed of the properties. But that violation of the Act did not entitle the plaintiffs to seek the annulment of the title and the recovery of the properties together with the fruits yielded or that should have been yielded. The title that a corporation may have on real property in violation of the Act is valid against everyone except the People of Puerto Rico, and if the lat-

---

[2 a] Section 3 of the above-mentioned Joint Resolution provides as follows: ". . . No corporation shall be authorized to conduct the business of buying and selling real estate or be permitted to hold or own real estate except such as may be reasonably necessary to enable it to carry out the purposes for which it was created, and every corporation hereafter authorized to engage in agriculture shall by its charter be restricted to the ownership and control of not to exceed five hundred acres of land; and this provision shall be held to prevent any member of a corporation engaged in agriculture from being in any wise interested in any other corporation engaged in agriculture. Corporations, however, may loan funds upon real estate security, and purchase real estate when necessary for the collection of loans, but they shall dispose of real estate so obtained within five years after receiving the title. Corporations not organized in Puerto Rico, and doing business therein, shall be bound by the provisions of this section so far as they are applicable."

ter does not institute the proper proceeding against the corporation,[3] not only does it hold the valid title but it may also convey it validly to any other person.[4] *Compañía Azucarera, etc.* v. *Registrar,* 19 P.R.R. 153; *Compañía Azucarera del Toa* v. *Registrar,* 19 P.R.R. 724; *Baetjer* v. *Registrar,* 48 P.R.R. 627; *Louisville School Board* v. *King* (Ky., 1908), 107 S.W. 247, 15 L.R.A. (N.S.) 379; *Abrams* v. *State,* 88 P. 327, 9 L.R.A. (N.S.) 186; 7 Fletcher Cyclopedia Corporations, Permanent Edition, 1931, § 3511; 4 Thompson on Corporations, Third Edition, § 2900; Annotation in 37 A.L.R. 204; *Myers* v. *Croft,* 80 U.S. 291; *Christian Union* v. *Yount,* 101 U.S. 352, 361, and *Fritts* v. *Palmer,* 132 U.S. 282. In the case of *Myers, supra,* and of *Christian Union, supra,* it was held that where personal property is sold to a corporation and the latter acquires the same in violation of the law, neither the vendor nor his predecessors are entitled to claim the property thus acquired by the corporation.

The Joint Resolution of May 1900 did not establish the remedy to make effective the prohibition against holding land in excess of 500 acres. It was necessary for the Legislature of Puerto Rico to establish the same by Act No. 47 of August 7, 1935 (Spec. Sess. Laws, p. 530), which amended §§ 2 and 6 of the Act establishing the *quo warranto* proceeding, approved March 1, 1902.[5]

---

[3] On July 19, 1937, a *quo warranto* proceeding was instituted in this court against Central Cambalache, Inc., and on March 12, 1942, this Court rendered a consent decree against it.

[4] The same doctrine has been applied to cases where foreign corporations not registered in Puerto Rico have acquired personal property in this island. *La Isabella Grove Inc.* v. *Reg. of San Juan,* 24 P.R.R. 240, and *P. R. Leaf Tobacco Co.* v. *Reg. of Caguas,* 24 P.R.R. 245.

[5] Sections 2 and 6 of said Act of March 1, 1902, as amended, read as follows in their pertinent part:

"Section 2.— . . . or whenever any corporation, by itself or through any other subsidiary or affiliated entity or agent, exercises rights, performs acts, or makes contracts in violation of the express provisions of the Organic Act of Puerto Rico or of any of its statutes, the Attorney General or any district attorney, either on his own initiative or at the instance of another person, may file before the Supreme Court of Puerto Rico a petition for an information in the nature of *quo warranto* in the name of The People of Puerto Rico; . . .

The constitutionality of the Act of 1935 was upheld in *People* v. *The Fajardo Sugar Co. of P. R.*, 50 P.R.R. 156, and 51 P.R.R. 867, and *People* v. *Rubert Hermanos, Inc.*, 53 P.R.R. 741, the latter being affirmed by the Supreme Court of the United States in *Puerto Rico* v. *Rubert Co.*, (1940) 309 U.S. 543, 84 L. ed. 916.

It will be noticed that even the People of Puerto Rico when expropriating or selling at public auction the property of a corporation which has violated said Joint Resolution can not deprive it of the property without paying compensation

---

"When any corporation by itself or through any other subsidiary or affiliated entity or agent is unlawfully holding, under any title, real estate in Puerto Rico, The People of Puerto Rico may, at its option, through the same proceedings, institute in its behalf the confiscation of such property, or the alienation thereof at public auction, within a term of not more than six months counting from the date on which final sentence is rendered.

"In every case, alienation or confiscation shall be [through] the corresponding indemnity as established in the law of eminent domain."

"Section 6.— . . .

"Whenever, in the opinion of the court, it is satisfactorily established that the corporation or corporations have performed acts or exercised rights not conferred by law, or in violation of the express provisions thereof, the judgment entered shall, in case the defendant is a domestic corporation, decree the dissolution thereof and the prohibition to continue doing business in the country; and in the case of a foreign corporation, the nullity of all acts done and contracts made by the defendant corporation or entity; and in addition, said judgment shall decree the cancellation of every entry or registration made by the said corporations in the public registries of Puerto Rico; *and when the decree of nullity affects real property and The People of Puerto Rico has chosen to confiscate it or orders it sold at public auction, the final judgment shall fix the reasonable price to be paid for said property. For these purposes, the just value of the property subject to alienation or confiscation shall be fixed in the same manner as it is fixed in cases of condemnation proceedings.*

"The violation of an order prohibiting the doing of business after final judgment is rendered shall be punished by a maximum fine of five hundred (500) dollars for each day such entity may continue in operation, enforceable on the property of the entity, and the persons representing it shall be guilty of contempt of court, punishable by imprisonment for a minimum term of from one to six months in jail.

" * * * * * * *

"For the purpose of fixing the value of the property, The People of Puerto Rico, through its agents or representatives, is authorized to enter the properties the object of the controversy, whatever their nature or condition may be." (Italics ours.)

pursuant to the provisions of the Eminent Domain Act. Moreover, it seems unfair that the plaintiffs, after their predecessors had obtained the two mortgage loans, should now withhold the amount of both loans and recover the properties together with the fruits yielded or that should have been yielded during the time that the same were in the possession of the corporation.

In our judgment, the lower court committed no error in holding that pursuant to the Joint Resolution and to the decisions of this court the Central could acquire a valid title against the plaintiffs.

## II

But, in our opinion, the lower court did err in holding that the judgment entered by the clerk in case No. 8597 was null because in the summons subdivision 4 of § 89 of the Code of Civil Procedure had been violated.

The summons issued in case No. 8597 reads in its pertinent part as follows:

"You are hereby notified that a complaint has been filed in the office of the clerk of the District Court of Arecibo of the judicial district of Arecibo praying that judgment be rendered adjudging the defendants to pay $56,574.07, which is the total amount of two loans together with the agreed interest, to wit: one for $25,000 made by the plaintiffs to Fernando González Cabeza and his wife Elisa Campos by deed No. 45 of April 14, 1920, before Notary Santiago B. Palmer, payable with interest at 8 per cent per annum, within the term of five years, divided in five equal installments to become due each one on July 30 of each year from 1921 until 1925 inclusive; and the other for $14,000 made by the same plaintiff to the same González Cabeza and his wife Elisa Campos, by deed No. 5 executed in Arecibo on May 22, 1920, before Notary Agraít, which amount they bound themselves to pay in six years, with interest at 9 per cent per annum, to become due as follows: $2,000 on May 22, 1921, and $2,400 on May 22 of each year of 1922, 1923, 1924, 1925 and 1926. In the first loan it was stipulated that if they defaulted in the payment of two installments of the principal or two installments of annual interest, the whole debt would become due and demandable, and in the second it was agreed that

if they defaulted in the payment of two consecutive installments of principal and interest, the whole debt would become due and demandable. The defendants have only paid $628.99. It is further sought that the court order the defendants to pay interest until final payment at the agreed rate, and also order them to pay the costs, disbursements, and attorney's fees. Plaintiff's attorney is Mr. José R. Aponte, whose office is at No. 2 Dr. Coll y Toste St., Arecibo, P. R.

"And you are further notified that upon your failure to answer said complaint within ten days from the date of its service, if service be made within the district, and within twenty days if service is made without the district but within the Island of Puerto Rico, and within forty days, if made elsewhere, *the plaintiff will obtain judgment according to the prayer in the complaint.*" (Italics ours.)

As may be seen from the language above, the summons furnished all the information which the clerk needed to enter the default judgment against the defendants. The amount claimed, $56,574.07, is stated in the summons and also the detail of the items composing the same. The only defect contained therein is that in the last paragraph above copied, the clerk did not repeat the amount for which plaintiff would obtain judgment in case the defendants should fail to appear, confining himself to stating that "the plaintiff may obtain judgment according to the prayer in the complaint." The clerk did not even have to make an arithmetical operation to determine the amount of the judgment, for, as we have noted, the amount claimed appeared at the beginning of the summons.

In *Freiría & Co.* v. *R. Félix Hermanos & Co.,* 20 P.R.R. 148, the mercantile firm of Freiría & Co., *S. en C.,* sued R. Félix Hermanos & Co. for $1,245.15. The defendant firm was summoned on February 15, 1909, in Caguas, through Román Félix Aponte, its sole manager. The defendant did not answer the complaint and the plaintiff moved that default be entered and judgment rendered against it. On March 3, 1909, default was entered and judgment rendered against the defendant firm ordering it to pay to the plaintiff the amount

claimed by the latter. On May 27, 1909, a writ of execution was issued and on September 10, 1910, the Marshal of the District Court of Humacao, in compliance therewith, attached certain properties belonging to the defendant Román Félix, and served notice of the attachment on him. On June 28, 1912, the attached properties were sold at public auction to the plaintiffs. On April 15, 1913, the defendant entered its appearance in the action ''only for the purpose of moving to quash the summons issued,'' on the ground that it did not contain the requisites prescribed by law, and after hearing both parties, the court, in its decision of April 19, 1913, held the summons and all subsequent proceedings to be null and void. On May 12, 1913, notice of the decision was served on plaintiff's attorney, and on the following day the latter took an appeal therefrom. This court, speaking through Mr. Justice del Toro, reversed the order appealed from and overruled defendant's motion. After making a careful study of the decisions of this court and of California it stated the following:

''An inspection of the judgment roll in this case shows the defect mentioned—that is, that the summons is not in strict accordance with the law—but it does not show that the district court failed to acquired jurisdiction over the persons of the defendants. In point of fact, they were summoned personally and notified of the claim of the plaintiffs, of their obligation to appear before a certain court within a fixed time and of what would be the result of their failure to appear. This last admonition was not given in strict accordance with the law, but as the defendants did not move the district court to set aside the judgment within the term in which judgment was rendered or within the period of six months prescribed by section 140 of the Code of Civil Procedure, and although they were notified personally of the levy under the execution in September, 1910, they did not move to be relieved from the effects of the judgment within a reasonable time, it must be concluded that the motion of the defendants of April 15, 1913, was filed too late to prosper in a court of justice.

'' 'Where a judgment is entirely void for want of jurisdiction the power to vacate it or set it aside is not limited to the term

at which it was rendered, but may be exercised at a succeeding term. And this applies as well to a want of jurisdiction of the subject-matter and to a lack of jurisdiction over the parties. But this rule cannot be extended so as to apply to mere errors and irregularities, and defects or irregularities in regard to the jurisdiction, such as make the judgment voidable at most, are not ground for vacating it after the term, especially where acquiesced in by the parties for a considerable length of time. 23 Cyc., 905, 906, and authorities cited.

"'A party who has knowledge of the judgment against him is required to exercise reasonable diligence in seeking to have it set aside, and his unexcused delay in making the application, amounting to laches, will justify the court in refusing the relief asked, especially where the vacating of the judgment would work unusual hardship to the opposing party, or where rights of innocent third persons have intervened.' 23 Cyc., 909, 910, and cases cited.

"In the case of *Bronson* v. *Schulten*, 104 U. S. 410, where the Supreme Court of the United States reversed a judgment rendered by the Circuit Court of the United States for the Southern District of New York wherein the said circuit court set aside a judgment which it had rendered seventeen years previously, the court, after a careful examination of the powers of courts of justice in cases of this character, said: 'It is also one of the principles of equity most frequently relied upon that the party seeking relief in a case like this must use due diligence in asserting his rights, and that negligence and laches in that regard are equally effectual bars to relief.'"

In *Ramos* v. *Sellés Casas & Co.*, 37 P.R.R. 563, which was an action for the recovery of money, Santiago Iglesias Silva was included as a party defendant. Summons was served on Iglesias and he failed to appear, whereupon judgment was rendered against him. He appealed from said judgment and alleged that the summons was void because it only notified him that if he failed to appear "[the plaintiff] may recover judgment as prayed for in the complaint." This court reversed the judgment as to Iglesias because the summons did not comply with the law. As may be seen, the *Ramos* case is distinguishable from the case at bar in that in the former Iglesias immediately appealed from the judgment entered

against him and assigned as error that said summons was void.

In *Martínez* v. *Figueroa,* 50 P.R.R. 908, an unlawful detainer proceeding was involved, wherein it was alleged that the judgment rendered in an action of debt against the predecessors of the defendants in the unlawful detainer proceeding was void, from which judgment plaintiff's title arose. In the action for the recovery of money the summons did not specify the sum for which judgment would be rendered if the defendant failed to appear. It appeared in the summons that attorney's fees had been fixed without specifying the amount and the clerk entered a default judgment although the amount involved was not liquid. It was held by this court that the default judgment was void.

In the case at bar we have already seen that the summons specified the amount claimed in the complaint, although at the end thereof the amount was not repeated, stating only that in case that the defendants failed to appear the plaintiff would obtain judgment according to the prayer in the complaint. The summons in the action brought by the Central against plaintiffs herein was issued on December 18, 1925, and served by the marshal three days later. The default judgment was entered on February 1, 1926. About 16 years after the default judgment has been entered the motion to quash the summons was filed. In our judgment the case of *Freiría & Co.* v. *R. Félix Hermanos & Co., supra,* is fully applicable herein.

The error committed by the clerk in regard to the interest when entering the default judgment as well as when issuing the writ of execution does not render the whole proceeding void. What happened with respect to the interest is what the Romans named *plus petitio,* that is, the error committed by the plaintiff when he claimed in his complaint more than what was really owed to him by the defendant.[6]

---

[6] *Plus petitio* included the action of seeking more than what was due in time, manner, place or amount as in the present case.

In the Roman law the controlling rule was to the effect that when the plaintiff knowingly claimed an amount greater than was due him, not only was he unable to obtain the amount claimed in excess but he lost what the defendant really owed him. This principle of Roman law was incorporated in Laws 42, 43, 44, and 45 of Title II of the Third *Partida*. It will be noticed that even in ancient law in order that a claim for an amount greater than was due could cause prejudice to the plaintiff, the latter had to make such claim knowingly, but such principle of law prevailing now in the Spanish law does not have the same scope as in the ancient law. At present in Spain as appears in Volume XXI of the *Enciclopedia Jurídica Española,* p. 531, the *plus petitio* is a demurrer which may be interposed against the complaint to bring it to its fair limits and the only penalty attached thereto, if it is shown that the plaintiff exceeded his claim voluntarily and knowingly in the complaint, is the imposition of costs as a punishment for his obstinacy. In Puerto Rico, except in an action to collect a mortgage in a summary foreclosure proceeding, when an appeal is taken from a judgment awarding more interest than that agreed upon, not even a reversal thereof lies but only a modification, conforming the claim to its fair limits, as was held by this court in *Muñoz* v. *Nieves,* 53 P.R.R. 331.[7]

And finally the fact that in the writ of execution in case No. 8597 the marshal was not required to satisfy the judgment out of the personal property of the debtor and if this were not sufficient then out of his real property pursuant to the provisions of subdivision 1, of § 240 of the Code of Civil Procedure, does not affect the validity of the judgment because, as it appears from the record, and was not controverted by the plaintiffs, in the public sale Attorney Lens Cuena appeared in representation of the plaintiffs here-

---

[7] The same doctrine prevails in California. *Shirran* v. *Dallas,* 132 P. 454, and *Hunt* v. *Loucks,* 38 Cal. 372.

in and sought, as he believed it beneficial to his clients, that the real property be sold as a whole and not by separate parcels. In our opinion, such an irregularity in a writ of execution which has been issued and served so many years ago, besides being alleged belatedly has been cured by the actions of the attorney in behalf of the then defendants.

### III

The conclusion which we have reached in regard to the validity of the Central's title to the real property relieves us from further determining whether the deed of August 26, 1927, constituted a ratification of said title.

As to the sale of the personal property, it is unquestionable that the widow and the children of age at that time conveyed to Oliver, Matienzo & Co., *S. en C.*, a valid title which the partnership in turn conveyed to the Central. But since at the time the personal property was sold, José Antonio González Campos was under age and the required judicial authorization was never obtained, we must decide whether there was any ratification of the sale of the personal property on his part. We have already seen that the $2,062.50 which belonged to him from the proceeds of the sale of the personal property was deposited in the bank in the name of his mother and of the district attorney; that under judicial authorization, $2,000 thereof was invested in a mortgage, that the same was later canceled and the amount invested in a house in the name of the minor; and lastly, that when José Antonio González Campos became of age he constituted a mortgage on the house to secure a loan of five hundred dollars which he received from Domingo Toledo. Under such circumstances, we can not agree with the lower court in holding that this conduct on the part of José Antonio González Campos does not constitute a ratification of the sale of his share in the personal property. The mortgage constituted by him is tantamount to the implied confirmation provided by § 1263 of the Civil Code.

For the reasons stated the judgment appealed from must be affirmed as to its dismissal of the complaint in regard to plaintiffs Elisa Campos Delgado and Juana María de los Angeles and Fernando González Campos, and reversed as to the relief granted in regard to José Antonio González Campos; and, ·therefore, judgment must be rendered as should have been entered by the lower court, that is, the complaint must be dismissed, with costs against the plaintiffs.