**ARROYO et al. v. PUERTO RICO TRANSP. AUTHORITY et al.**

No. 4198.

Circuit Court of Appeals, First Circuit.

Dec. 10, 1947.

Guillermo Cintron Ayuso, of San Juan, P. R., for appellants.

Paul A. Sweeney, Atty., Dept. of Justice, of Washington, D. C. (Peyton Ford, Asst. Atty. Gen., Emery Cox, Jr., Atty., Dept. of Justice, Mastin G. White, Sol., Dept. of the Interior, Irwin W. Silverman, Chief Counsel, Division of Territories and Island Possessions, Dept. of the Interior, and Shirley Ecker Boskey, Atty., Dept. of the Interior, all of Washington, D. C., on the brief), for appellees.

Before MAGRUDER, MAHONEY and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

This is an appeal from a final decree of the United States District Court for Puerto Rico vacating a temporary injunction and dismissing a complaint seeking injunctive relief and a declaratory judgment.

The complaint alleges that the named plaintiffs are engaged in the lawful business of transporting passengers by motor bus in the San Juan metropolitan area under permits, and certificates of necessity and convenience, to them issued, respectively, by the Public Service Commission of Puerto Rico, and that the said plaintiffs sue on their own behalf and on behalf of numerous other public carriers for hire similarly situated. Named as defendants are the Puerto Rico Transportation Authority; Jose G. Bloise, its general manager; Antonio R. Barcelo and Enrique Cornier in their capacity as Public Service Commissioners of Puerto Rico. It is alleged that the defendants have concerted together to

procure for the Transportation Authority. a monopoly of the entire transportation business in the San Juan metropolitan area, and that in pursuance of such scheme the defendant Public Service Commissioners have threatened plaintiffs with unlawfully "cancelling their permits" and with preventing them from pursuing their trade as public carriers in violation of their rights under the Constitution of the United States and under the Organic Act of Puerto Rico.

It is faintly suggested by defendant-appellees that the court below had no jurisdiction to entertain the complaint. Under the Organic Act, 48 U.S.C.A. § 863, the United States District Court for Puerto Rico has "jurisdiction of all cases cognizable in the district courts of the United States". Such district courts, under paragraph (1) of § 24 of the Judicial Code, 28 U.S.C.A. § 41(1), have original jurisdiction of "all suits of a civil nature, at common law or in equity * * * where the matter in controversy exceeds, exclusive of interest and costs, the sum or value of $3,000, and (a) arises under the Constitution or laws of the United States * * *." The present complaint alleges that the action threatened will deprive plaintiffs of their property rights without due process of law and deny them the equal protection of the laws in violation of the Fifth and Fourteenth Amendments to the Constitution and of § 2 of the Organic Act, 48 U.S.C.A. § 737. While the Fourteenth Amendment is a limitation only upon the states, the due process clause of the Fifth Amendment is applicable ex proprio vigore to Puerto Rico. See Balzac v. Porto Rico, 1922, 258 U.S. 298, 312, 313, 42 S.Ct. 343, 66 L.Ed. 627; People of Puerto Rico v. Eastern Sugar Associates, 1 Cir., 1946, 156 F.2d 316, 321, 322; Thornberg v. Jorgensen, 3 Cir., 1932, 60 F.2d 471. In any event, Congress has written these guaranties into a bill of rights specifically applicable to Puerto Rico, in § 2 of the Organic Act. We have no doubt that § 2 is one of the "laws of the United States" within the meaning of § 24(1) of the Judicial Code; and that a complaint making a claim under § 2 raises a federal question within the jurisdiction of the United States District Court for Puerto Rico, the requisite jurisdictional amount being present (which is conceded here). See Munoz v. Porto Rico Ry. Light & Power Co., 1 Cir., 1936, 83 F. 2d 262, 264; Gallardo v. Questell, 1 Cir., 1928, 29 F.2d 897. Cf. Bell v. Hood, 1946, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939. We have held that the Organic Act is a "statute * * * of the United States" within the meaning of the analogous provision of § 128 of the Judicial Code, 28 U.S.C.A. § 225, giving this court appellate jurisdiction to review final decisions of the Supreme Court of Puerto Rico in all cases involving "the Constitution or a statute or treaty of the United States or any authority exercised thereunder", without limitation as to value in controversy. Municipality of Rio Piedras v. Serra, Garabis & Co., Inc., 1 Cir., 1933, 65 F.2d 691; Russell & Co. v. People of Puerto Rico, 1 Cir., 1941, 118 F.2d 225, 229; Fitzsimmons v. Leon, 1 Cir., 1944, 141 F.2d 886, 888; Gallardo v. Gonzalez, 1 Cir., 1944, 143 F.2d 947, 949.

What we have said above is in no way inconsistent with the holding in Puerto Rico v. Rubert Hermanos, Inc., 1940, 309 U.S. 543, 60 S.Ct. 699, 84 L.Ed. 916. That case involved the provision of § 39 of the Organic Act, 48 U.S.C.A. § 752, that "every corporation hereafter authorized to engage in agriculture shall by its charter be restricted to the ownership and control of not to exceed five hundred acres of land". Section 39 imposed no penalty for violation of this restriction. However, a sanction was supplied by acts of the insular legislature which authorized the government of Puerto Rico to bring a quo warranto proceeding in the Supreme Court of Puerto Rico against any corporation violating this provision of the Organic Act. It was contended that such jurisdiction could not be conferred upon the Supreme Court of Puerto Rico because it ran afoul of § 256 of the Judicial Code, 28 U.S.C.A. § 371. Section 256 provides that the jurisdiction vested in the courts of the United States of "all suits for penalties and forfeitures incurred under the laws of the United States" shall be "exclusive of the courts of the several States".[1] Since the

---

[1] Note that the exclusion is of state courts, not territorial courts.

"penalties and forfeitures" involved in the Rubert Hermanos case were provided, not by act of Congress, but by an act of the legislature of Puerto Rico, it follows that the quo warranto proceeding in the Supreme Court of Puerto Rico was not a suit "for penalties and forfeitures incurred under the laws of the United States", within the meaning of § 256 of the Judicial Code. And since § 39 of the Organic Act contained no penalty, § 39 was evidently not a law of the United States under which a penalty was incurred. The unique situation presented in the Rubert Hermanos case was therefore not within the purview of § 256 of the Judicial Code.

On the merits, we think the District Court was right in dismissing the complaint. The evidence makes clear that no threat to "cancel" valid permits is involved. The Public Service Commission, as fully authorized by law, issued temporary emergency permits to the plaintiffs. These permits expired by their own terms. In accordance with a previously announced policy, the permits were not renewed beyond their expiration date. Plaintiffs have not been deprived of property rights without due process of law.

■■■■ The Public Service Commission of Puerto Rico derives its powers both from the Organic Act and from insular legislation. See §§ 38 and 39 of the Organic Act, as amended, 48 U.S.C.A. §§ 750, 752, 753; The Public Service Act of Puerto Rico, Laws of Puerto Rico 1917, vol. II, p. 432, Act No. 70, as amended, Laws of Puerto Rico 1927, p. 398, Act No. 2, Second Special Session. See Santiago v. Public Service Commission, 1927, 37 P.R.R. 467; In the Matter of the White Star Bus Line, Inc., 1938, 53 P.R.R. 370, 586, appeal dismissed sub nom. Ortiz v. Public Service Commission, 1 Cir., 1940, 108 F.2d 815. See also Public Service Commission v. Havemeyer, 1936, 296 U.S. 506, 56 S.Ct. 360, 80 L.Ed. 357. No private individual has the right to engage in the transportation of passengers by bus for hire without a permit or license from the Commission. In the Matter of the White Star Bus Line, Inc., supra.

By Act No. 125, approved May 7, 1942, Laws of Puerto Rico 1942, p. 710, the legislature created the Puerto Rico Transportation Authority as a governmental instrumentality "to develop and improve, own, operate, and manage any and all types of transportation facilities and services in, to, and from the Island of Puerto Rico". The Transportation Authority entered actively into the field of bus transportation by purchasing the property of and attempting to operate the bankrupt White Star Bus Line which had previously held an exclusive franchise for the transportation of passengers by bus in the San Juan metropolitan area. See Santiago v. Public Service Commission, supra. Wartime shortages handicapped efforts to obtain additional buses and spare parts, with the result that the Transportation Authority was unable to provide adequate service. To supply this deficiency the Public Service Commission found it necessary, on September 10, 1942, to authorize a number of independent truck owners to engage in passenger transportation between San Juan and Rio Piedras on a temporary basis. They were issued provisional emergency permits and were given to understand that the said permits could be canceled at any time the Public Service Commission might deem such action convenient in the public interest or when the Transportation Authority could fully handle traffic. Later the Commission issued similar permits for the operation of independent automotive passenger vehicles in San Juan, the permits being entitled "Six Months' License—Provisional for Emergency". In addition to these permits, the Commission also granted a smaller number of certificates of necessity and convenience of three-years' duration, covering certain routes where the service was extremely inadequate. The District Court found, on sufficient evidence, that such of the plaintiffs' operations "as depend on certificates of necessity and convenience which have not yet expired are not at present threatened by defendants," and so far as the present appeal is concerned these certificates may be left out of account. See South Porto Rico Sugar Co. v. Munoz, 1 Cir., 1928, 28 F.2d 820.

By resolution of May 18, 1944, the Commission stated that its ultimate policy was to enable the Transportation Authority "to

take charge exclusively of the bus service in the metropolitan area between San Juan and Rio Piedras" as rapidly as its expanding facilities would permit. Therefore, the Commission reiterated a previous announcement that "as the Transportation Authority increases its necessary equipment an equal number of provisional permits for independent buses will be cancelled". Further, the Commission stated at that time that it could not "undertake to fix a specific period of time during which the provisional permits of the independent buses will be effective, as the addition of new units by the Transportation Authority depends on flexible factors and on the circumstances of each occasion." It announced further that it would be unnecessary to hold public hearings on these matters "in view of the fact that the Commission has already formulated its policy as above set forth."

On August 17, 1944, the Commission passed a resolution stating that as a result of a survey it was concluded that 230 buses were at that time sufficient for the rush hours in the metropolitan area; that the number of independent buses should be limited to a maximum of 126 during rush hours; that during the hours of light traffic 30 units of the fleet of independent buses which had theretofore been operating under special provisional permits should be withdrawn from service on August 21, 1944; that the number of independent buses to be thus withdrawn during hours of light traffic should be progressively increased thereafter as conditions warranted. The resolution also contained the following recital, which we quote because of the great stress put upon it by appellants: "The Public Service Commission authorizes the owners of independent buses who heretofore had been operating their vehicles under special provisional licenses, and in order to enable them to continue operating their units under the conditions and in the numbers established by this resolution, to operate their buses during a maximum period of one year after the termination of war in Europe, and upon the termination of the war in Europe all special provisional permits issued to owners of independent buses will be cancelled and

without any legal effect whatsoever and said vehicles shall be finally withdrawn from service in the metropolitan area."

Several points are to be noted with reference to the above:

(1) It is no more than an announcement of general policy, and does not in itself constitute a blanket permit to independent bus owners to operate in the metropolitan area. Such permits were issued individually to the various bus owners, and the terms expressed in the permits control as to the extent of the privilege given.

(2) The statement of policy does not promise that all persons theretofore operating under special provisional permits will be allowed to continue operation until "one year after the termination of war in Europe". That is merely stated to be the "maximum" period during which it was to be expected that any independent buses would be operated under special permits. The Commission had earlier announced, in its resolution of May 18, 1944, that the number of persons operating under such permits would be progressively decreased as the Transportation Authority acquired additional facilities. The Commission evidently thought, and so stated on August 17, 1944, that within one year after the termination of the war in Europe, and the consequent easing of war demands upon factory output, buses and parts would be available to the Transportation Authority in sufficient quantity to enable the Authority to take over an exclusive bus service.

(3) The phrase "one year after the termination of war in Europe" is the Commission's own language, which, in its context, evidently refers to the actual cessation of fighting, and not to some technical status to be determined by proclamation of the President.

To resume the chronological statement, a resolution of the Commission supplementary to its one of August 17, 1944, was adopted on September 13, 1944, setting forth the details for withdrawing buses from service during hours of light traffic.

Pursuant to a request of the independent operators, the Commission by resolution on September 28, 1944, directed its secretary to issue "special provisional permits to

each and everyone of the owners of independent buses which are presently rendering services in the metropolitan area, which permits shall be effective for a period of one year commencing on the first day of October, 1944 and terminating on the 30th day of September, 1945, subject to the terms and conditions set forth in the resolutions approved by this Commission on the 17th of August, 1944 and on the 13th of September, 1944."

▇▇▇ The special provisional permits issued after September 30, 1945, each contained the statement: "This license is valid to May 7, 1946." This date was fixed by reference to V-E Day, May 8, 1945, the date on which the enemy forces in Europe unconditionally surrendered, and which the Commission took to be the date of the "termination of the war in Europe" within the meaning of that phrase in its resolution of August 17, 1944. The Commission concluded that within a year from May 8, 1945, the Transportation Authority would be in a position to take over the whole of the transportation service in the metropolitan area.

The present complaint, which was filed in the court below on April 18, 1946, was predicated on the theory that plaintiffs then held licenses or franchises entitling them to operate until "one year after the termination of the war in Europe". It was alleged that the "second World War has not terminated, for peace negotiations to end the said war have not even begun as yet." Defendants' announced policy of not renewing plaintiffs' permits beyond the date of May 6, 1946, was therefore asserted to constitute a threatened destruction of existing property rights without due process of law.

After the decree below was entered and appeal had been taken therefrom, the President, on December 31, 1946, issued Proclamation 2714 proclaiming "the cessation of hostilities of World War II, effective twelve o'clock noon, December 31, 1946." (12 F.R. 1) Plaintiffs now urge that the date so proclaimed must be applied to the Commission's resolution of August 17, 1944—"a maximum period of one year

after the termination of war in Europe"—so that plaintiffs must be recognized as having a right to operate up to December 31, 1947. The argument is entirely without substance, as the preceding statement of facts makes clear. Plaintiffs' permits expired May 7, 1946, by their own express terms. The President's proclamation has nothing to do with the case. It proclaimed the cessation of hostilities of the global war, not the termination of the war in Europe, and the purpose of the proclamation, which set a more or less arbitrarily selected date, was to fix a definite termination date for a large number of wartime statutes. See Note, 47 Col.L.Rev. 255, 261 (1947). The proclamation in no way detracts from the reasonableness of the Commission's interpretation of its own language announcing its policy with reference to the issuance of provisional permits. The Commission was not required to have a hearing before making the determination that, for its purposes, the war in Europe terminated May 8, 1945.

▇▇▇ One of the prayers in the complaint was for a declaration that Act No. 125, approved May 7, 1942, creating the Transportation Authority, was on various grounds invalid under the Organic Act, and that the Authority exists therefore in violation of law. We think the District Court properly refused to pass upon the validity of Act No. 125 in this proceeding. Whether or not Act No. 125 is valid, it remains true that the right of plaintiffs to operate buses in the metropolitan area is dependent upon the terms of the special permits issued by the Public Service Commission. As above set forth, these permits have expired. So far as appears, appellants have never made formal application to the Commission for renewal of their special provisional permits after these had expired on May 7, 1946. Certain of the holders of these special permits made application to the Commission for 15-year franchises to operate buses in San Juan. If the Commission denies these applications, there is statutory provision for judicial review in the insular courts.

The decree of the District Court is affirmed.