ELISA CAMPOS DELGADO, ANGELITA, FERNANDO y JOSÉ ANTONIO GONZÁLEZ CAMPOS, demandantes, apelantes y apelados, *v.* CENTRAL CAMBALACHE, INC., y JUAN GONZÁLEZ CAMPOS, demandados, apelados y apelante la primera.

Núm. 8815.—*Sometido:* Enero 20, 1944. *Resuelto:* Julio 28, 1944.

*A. Reyes Delgado, P. Santos Borges* y *Luis Mercader*, abogados de los demandantes, apelantes y apelados; *G. Zeno Sama* y *Francisco M. Cadilla*, abogados de Central Cambalache, Inc., demandada, apelada y apelante.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

Por escritura de 14 de abril de 1920 Fernando González Cabeza hipotecó, con el consentimiento expreso de su esposa Elisa Campos, varias fincas de su propiedad a favor de la Central Cambalache, Inc., en garantía de un préstamo por la cantidad de veinticinco mil dólares. Se obligó a pagar la deuda en plazos anuales de cinco mil dólares con interés al ocho por ciento anual, venciendo el primer plazo el 30 de julio de 1921 y los otros sucesivamente el mismo mes y día de cada año subsiguiente hasta el año 1925, en que vencería el último de dichos plazos. Se convino que vencidos dos plazos de capital o dos anualidades de intereses sin efectuarse puntualmente su pago, se consideraría vencida la totalidad de la deuda.

Por otra escritura de 22 de mayo de 1920 González Cabeza y su esposa constituyeron otra hipoteca a favor de la misma central en garantía de otro préstamo por la cantidad de catorce mil dólares. Se estipuló que la cantidad adeudada se satisfaría en el término de seis años (dos mil dólares el 22 de mayo de 1921, y dos mil cuatrocientos dólares en el mismo mes y día de los años 1922 hasta el 1926 inclusive), con intereses al nueve por ciento anual pagaderos por anualidades vencidas en el domicilio de la acreedora. Se convino que si el deudor dejare de pagar dos plazos consecutivos de capital e intereses, se consideraría vencida la deuda.

González Cabeza falleció el 31 de mayo de 1923, sucediéndole su viuda en la cuota usufructuaria y sus hijos Juana María de los Angeles, Fernando, Juan y José Antonio González Campos. Su madre Juana Cabeza de Madero recibió por concepto de legado el usufructo del tercio de libre dis-

posición, habiendo sido nombrada como su sustituta la hermana del testador, Guillermina González Cabeza.

Vencidos los dos créditos hipotecarios, y habiendo satisfecho los deudores solamente la suma de $628.99 a cuenta de ellos, el 18 de diciembre de 1925 la central radicó en la corte inferior el pleito número 8597 en cobro de dinero contra Elisa Campos Delgado y sus hijos, suplicando una sentencia por la cantidad de $56,574.07, con intereses hasta su pago total, más costas, gastos y honorarios de abogado. En el emplazamiento que se expidió el secretario expuso lo siguiente:

"Y se notifica a ustedes que de no comparecer a contestar dicha demanda . . . la demandante podrá obtener una sentencia de acuerdo con lo solicitado en la demanda."

No comparecieron los demandados y el secretario registró una sentencia en rebeldía,[1] y el 26 de agosto de 1926 fueron vendidas globalmente en pública subasta las fincas hipotecadas, las cuales fueron adjudicadas por la cantidad de $56,574.07 a la sociedad Oliver, Matienzo & Co., S. en C., otorgándose la escritura de venta judicial el dos de septiembre siguiente.

Por escritura de 26 de agosto de 1927 los hijos mayores de edad de González Cabeza y su viuda, por sí y como madre con patria potestad sobre el menor José Antonio, vendieron por el precio de $28,675 a la mencionada sociedad una plantación de caña de azúcar de doscientas cuerdas más o

---

(1) La parte dispositiva de la sentencia dice:

"Por tanto, habiéndose hecho constar la rebeldía de los demandados, y tratándose de un pleito que nace de un contrato sobre pago de dinero, procedo a anotar en el récord de la corte la sentencia por la cual los demandados Elisa Campos, Juana María de los Angeles, Fernando, Juan y José González Campos son condenados a pagar a la corporación demandante, Central Cambalache, Inc., la suma especificada en la citación de cincuenta y seis mil quinientos setenta y cuatro dólares con siete centavos, importe total a que ascienden los dos préstamos antes referidos con sus intereses estipulados, *así como los intereses que se devenguen a los tipos convenidos hasta el día de su pago y las costas del pleito.*" (Bastardillas nuestras.)

menos que tenían sembrada en las fincas subastadas, aperos de labranza y bienes semovientes, reteniendo la compradora la cantidad de $9,625.78 que los vendedores adeudaban a la central por concepto de refacción agrícola. Luego de consignar la venta, se estipuló lo siguiente en la cláusula "D" de la escritura:

"Es expresamente convenido que doña Elisa Campos y sus hijos renuncian y traspasan voluntariamente cuantos más derechos pudieran tener en las fincas propiedad de Oliver, Matienzo y Compañía, adquiridas por compra en subasta pública y especialmente el derecho de *homestead* que tuvieran en las mismas, cuya renuncia se hace a favor de Oliver, Matienzo y Compañía, en consideración también a la cantidad recibida por aquéllos, de acuerdo con la Ley aprobada en doce de marzo de mil novecientos tres."

A virtud de la citada escritura de 26 de agosto de 1927 correspondió a la viuda $8,250 por su participación en los bienes vendidos, y $2,062.50 a cada uno de los hijos, pero como no se había obtenido la aprobación judicial del contrato celebrado en cuanto al menor respecta, su participación fué depositada en el American Colonial Bank a nombre de su madre y del fiscal de la Corte de Distrito de Arecibo, hasta que se consiguiera la aprobación judicial. No fué hasta que se otorgó esta escritura que la viuda e hijos de González Cabeza entregaron a la sociedad las fincas que le fueron adjudicadas en la venta judicial.

Por escritura de 3 de octubre de 1927 Guillermina González Cabeza, quien por haber muerto su madre la sustituyó como usufructuaria en el tercio de libre disposición, vendió a la sociedad el usufructo por la cantidad de quinientos dólares.

Y por último, por escritura de 11 de enero de 1932 la sociedad, en satisfacción de sus deudas con la central, le dió en pago todas las fincas que poseía, entre las cuales se hallaban las reclamadas por los demandantes.

Diez años más tarde, a fines de 1941 o a principios de 1942[2] Elisa Campos Delgado y sus hijos, con excepción de Juan, quien por no querer unirse a los demandantes fué hecho parte demandada, radicaron en la corte inferior un pleito contra la central sobre nulidad de la sentencia dictada en el pleito 8597, reivindicación y daños y perjuicios. En la demanda se exponen dos causas de acción. En la primera se describen las fincas que a virtud del pleito 8597 adquirió la sociedad. Se alega que ésta actuaba en interés y para beneficio de la central, siendo sus socios Andrés Oliver Roses y José Matienzo Lezcano, presidente y vicepresidente respectivamente de la Central Cambalache, Inc.; que siendo ésta una corporación agrícola, las dos escrituras de hipoteca otorgadas a su favor eran nulas a virtud de la prohibición contenida en la sección 3 de la Resolución Conjunta aprobada el 1 de mayo de 1900 por el Congreso de los Estados Unidos, incorporada después en la vigente Ley Orgánica, artículo 39; que la sociedad actuaba como una entidad jurídica para facilitar la violación de la prohibición antes referida, y que como la adjudicación que a favor de la sociedad se hizo en el acto de la subasta era simulada, toda vez que, la que en verdad compró las fincas fué la central y ésta no podía adquirirlas legalmente, la adjudicación fué nula; que desde que las fincas fueron entregadas a la sociedad, la central las ha venido poseyendo y cultivando como suyas; y que los demandantes han solicitado de la central que les entregue la posesión de las fincas, a lo cual se ha negado.

Como segunda causa de acción se alegó que desde el 2 de septiembre de 1926 la central ha venido explotando las fincas, sembrándolas de frutos menores, pastos y caña que ha convertido en azúcar y mieles, y ha recibido beneficios de la Administración de Ajuste Agrícola por las cañas dejadas de sembrar o las dejadas de cortar; que lo producido por

[2] La demanda enmendada que aparece en los autos está fechada el 9 de febrero de 1942, y no hay constancia de la fecha en que se presentó la demanda original.

las fincas después de pagar los gastos de explotación, contribuciones sobre la propiedad y seguro de cosecha, asciende a la cantidad de $125,000; y que los demandantes han requerido a la central para que les entregue las fincas y les pague la suma de $125,000 por concepto de frutos líquidos, a lo cual se ha negado. Termina la demanda con súplica de una sentencia que declare:

(1) Que es inexistente la adjudicación de las fincas en pública subasta hecha a la central por conducto de la sociedad, y que son nulas las escrituras otorgadas con motivo de dicha venta por las siguientes razones: (a) porque la central no tenía capacidad legal para adquirir las fincas cuando se otorgó la escritura de venta judicial a favor de su instrumento la sociedad, ni tampoco la tuvo más tarde cuando la sociedad le traspasó las fincas ni la tiene en la actualidad; (b) porque la sentencia a virtud de la cual se ordenó la venta en pública subasta es nula y sin ningún valor, toda vez que el emplazamiento no cumplió con los requisitos de ley, siendo éste por consiguiente nulo e inexistente, y consecuentemente el secretario carecía de facultad para registrar la sentencia en rebeldía; y (c) porque los actos realizados para transferir los títulos de los demandantes a la central fueron sobre la base de que las fincas serían hipotecadas a The Federal Land Bank of Baltimore para beneficio de la sucesión demandante;

(2) Que la central debe dejar las fincas a la libre disposición de los demandantes;

(3) Que la central debe pagar a los demandantes la suma de $125,000 por concepto de frutos líquidos, con los intereses correspondientes al seis por ciento desde la fecha en que se dicte sentencia hasta su total pago; y

(4) Que se impongan costas, gastos y honorarios de abogado a la demandada.

Oídas las partes, la corte inferior declaró que eran válidas las hipotecas otorgadas a favor de la central; que el

título que ésta había adquirido al transferirle la sociedad las fincas solámente podía ser anulado por El Pueblo de Puerto Rico, y que los demandantes no tenían derecho a atacar el título de la central, pero que la adjudicación que se hizo a la sociedad era nula porque (1) el emplazamiento adolecía del defecto de no expresar la cantidad por la cual la central podía obtener sentencia en caso de que los demandados no contestaran la demanda, (2) al registrarse la sentencia en rebeldía el secretario erróneamente condenó a los demandados a pagar intereses de mora al mismo tipo que se había convenido para la obligación, a pesar de que en las escrituras de hipoteca no se estipularon intereses de mora, y (3) en el mandamiento de ejecución, contrario a lo convenido en la escritura de hipoteca de veinticinco mil dólares y a lo decretado en la sentencia, se ordenó ejecutar en satisfacción de los intereses computándolos a razón de nueve por ciento anual en vez de ocho por ciento como se estipuló en el contrato de hipoteca. Sin embargo, resolvió la corte que a virtud de la escritura de 26 de agosto de 1927 la viuda y sus hijos mayores de edad habían ratificado la venta judicial efectuada en el pleito 8597, y por consiguiente estaban impedidos de alegar su nulidad, pero que en cuanto al menor la referida escritura no tuvo el efecto de ratificar la venta judicial, porque en ningún momento fué sometida a la aprobación judicial. Sostuvo además que aunque con los $2,062.50 que correspondieron al menor adquirió éste una casa, la cual hipotecó después de haber llegado a la mayoridad, tales transacciones no tuvieron el efecto de ratificar implícitamente la venta judicial, porque la cantidad de $2,062.50 recibida por el menor procedía del precio de venta de los bienes muebles a que antes se ha hecho referencia. Por último declaró la corte inferior que la central ni directa ni indirectamente había engañado o coaccionado a los ahora demandantes para conseguir que no se defendiesen.

A base de estas conclusiones la corte dictó sentencia declarando la demanda con lugar en cuanto al demandante José Antonio González Campos y sin lugar en cuanto a los demás. Condenó a la central a devolver al referido demandante un condominio de una octava parte en cada una de las fincas, sujetos los condominios a las disposiciones del testamento de González Cabeza en cuanto al usufructo que legó a su madre y que en sustitución de ésta adquirió su hermana Guillermina; y si la central no pudiese poner los condominios a la disposición del referido demandante, a pagarle su importe en dinero, debiendo someter a la corte la solicitud de valoración en caso de que no llegaren a un acuerdo. La condenó además a pagar al demandante una octava parte de la cantidad de treinta y nueve mil dólares que ha sido fijada como valor de los bienes muebles transmitidos por la escritura de 26 de agosto de 1927, debiendo deducirse de esa octava parte la cantidad de $2,062.50 que fué depositada en el banco a disposición del demandante a virtud de lo estipulado en la mencionada escritura. Ordenó la corte que la central venía obligada a pagar al demandante dos tercios de una octava parte de $96,000, que era lo que podía reclamar como frutos líquidos de las fincas desde el 1927 en adelante, teniendo en cuenta las disposiciones del testamento de su padre sobre el usufructo del tercio de libre disposición. Finalmente la condenó a pagar a este demandante las costas y dos mil dólares de honorarios de abogado.

Los demandantes, con excepción de José Antonio González Campos, apelaron de la sentencia. También apeló la central demandada en cuanto al pronunciamiento que se hizo a favor de José Antonio González Campos.

Las cuestiones a resolver en el presente recurso son:

I. ¿Podía la central obtener título válido sobre las tierras que pertenecieron a González Cabeza, a pesar de lo dispuesto en la sección 3 de la Resolución Conjunta aprobada el 1 de mayo de 1900 por el Congreso de los Estados Unidos?

II. Suponiendo que la central hubiere adquirido título válido contra González Cabeza y sus causahabientes, ¿fué nulo el procedimiento judicial a virtud del cual los ahora demandantes fueron desposeídos del título que tenían sobre las fincas?

III. En el supuesto de que el procedimiento indicado fuese nulo, ¿hubo ratificación por parte de los ahora demandantes?

I

■ No existió impedimento legal alguno para concertar los préstamos hipotecarios entre la central y González Cabeza. La sección 3 de la Resolución Conjunta aprobada el 1 de mayo de 1900 [2a] expresamente autoriza a las corporaciones a efectuar préstamos con garantías sobre bienes raíces y a adquirir éstos cuando sea necesario para el cobro de los préstamos, sujeta la adquisición a la condición de que la corporación deberá disponer de los bienes raíces así obtenidos dentro de los cinco años de haber recibido el título de propiedad de los mismos. Como muy bien dijo el juez de la corte *a quo,* si la central podía adquirir directamente los bienes con la condición indicada, también podía adquirirlos indirectamente por conducto de su instrumento Oliver, Ma-

---

[2a] La disposición contenida en la sección 3 de la Resolución Conjunta arriba citada dice lo siguiente:

"Ninguna corporación estará autorizada para efectuar negocios de compra y venta de bienes raíces; ni se le permitirá poseer o tener dicha clase de bienes a excepción de aquellos que fuesen racionalmente necesarios para poder llevar adelante los propósitos a que obedeció su creación; y, en lo sucesivo, el dominio y manejo de terrenos de toda corporación autorizada para dedicarse a la agricultura, estarán limitados, por su carta constitutiva, a una cantidad que no exceda de quinientos acres; y esta disposición se entenderá en el sentido de impedir a cualquier miembro de una corporación agrícola que tenga interés de ningún género en otra sociedad de igual índole.

"Podrán, sin embargo, las corporaciones efectuar préstamos, con garantías sobre bienes raíces, y adquirir éstos cuando sea necesario para el cobro de los préstamos; pero deberán disponer de dichos bienes raíces así obtenidos dentro de los cinco años de haber recibido el título de propiedad de los mismos.

"Las corporaciones que no hayan sido organizadas en Puerto Rico, y que hagan negocios allí, estarán obligadas a cumplir lo dispuesto en este Artículo, hasta donde sea aplicable."

tienzo & Co., S. en C. Debemos, pues, concluir que en lo que a la Resolución Conjunta respecta, la central adquirió un título válido. Es verdad que desde la fecha en que se adjudicaron los bienes a la sociedad—26 de agosto de 1926—y aun prescindiendo de esa fecha y tomando como punto de partida el once de enero de 1932, cuando la sociedad los dió en pago a la central, hasta la radicación de la demanda original en el presente caso—a fines del año 1941 o a principios del 1942—había transcurrido con exceso el plazo de cinco años dentro del cual la central debió deshacerse de las fincas. Pero esa violación de la ley no confería a los demandantes derecho alguno para solicitar la declaración de nulidad del título y la reivindicación de los bienes con los frutos producidos o debidos producir. El título que sobre los bienes raíces pueda tener una corporación en violación de la ley es válido contra todo el mundo excepto contra El Pueblo de Puerto Rico, y mientras éste no ejercite el procedimiento correspondiente contra la corporación,[3] no sólo retiene ella un título válido si que puede transmitirlo válidamente a cualquiera otra persona.[4] *Compañía Azucarera, etc.* v. *Registrador,* 19 D.P.R. 152; *Compañía Azucarera del Toa* v. *Registrador,* 19 D.P.R. 759; *Baetjer* v. *Registrador,* 48 D. P.R. 647; *Louisville School Board* v. *King* (Ky., 1908), 107 S. W. 247, 15 L.R.A. (N. S.) 379; *Abrams* v. *State,* 88 Pac. 327, 9 L.R.A. (N. S.) 186; 7 Fletcher Cyclopedia Corporations, Edición Permanente, 1931, sección 3511; 4 Thompson on Corporations, Tercera Edición, sección 2900; Monografía en 37 A.L.R. 204; *Myers* v. *Croft,* 80 U. S. 291; *Christian Union* v. *Yount,* 101 U. S. 352, 361, y *Fritts* v. *Palmer,* 132 U. S. 282. En los casos de *Myers,* supra, y de *Christian*

---

(3) El 19 de julio de 1937 se radicó ante este tribunal querella de *quo warranto* contra la Central Cambalache, Inc., habiéndose dictado el 12 de marzo de 1942 decreto por consentimiento contra ella.

(4) El mismo principio se ha aplicado en los casos en que corporaciones extranjeras no registradas en Puerto Rico han adquirido bienes inmuebles en esta Isla. *La Isabella Grove, Inc.* v. *Registrador de San Juan,* 24 D.P.R. 257, y *P. R. Leaf Tobacco Co.* v. *Registrador de Caguas,* 24 D.P.R. 262.

*Union,* supra, se resolvió que vendida propiedad inmueble a una corporación, adquiriéndola ésta en violación de la ley, ni el vendedor ni sus causahabientes tienen derecho a reclamar la propiedad así adquirida por la corporación.

La Resolución Conjunta de primero de mayo de 1900 no estableció el remedio para hacer efectiva la prohibición de poseer tierras en exceso de quinientos acres. Fué necesario que la Asamblea Legislativa de Puerto Rico lo crease por la Ley núm. 47 de 7 de agosto de 1935 (Sesión Extraordinaria, pág. 531), la cual enmendó las secciones 2 y 6 de la Ley Estableciendo el Procedimiento del *Quo Warranto* aprobada el 1 de marzo de 1902.[5]

La constitucionalidad de la ley de 1935 fué sostenida en los casos de *Pueblo* v. *The Fajardo Sugar Co. of P. R.,* 50 D.P.R. 163, y 51 D.P.R. 876, y *Pueblo* v. *Rubert Hermanos, Inc.,* 53 D.P.R. 779, siendo este último confirmado por la Corte Suprema de los Estados Unidos en el de *Puerto Rico* v. *Rubert Co.* (1940), 309 U. S. 543, 84 L. Ed. 916.

[5] Las secciones 2 y 6 de la referida Ley de 1 de marzo de 1902, según fueron enmendadas, en lo pertinente dicen:

"Sección 2.—. . . o cuando cualquier corporación por sí, o a través de cualquier otra entidad subsidiaria o afiliada o agente ejercite derechos o realice actos o contratos en contravención a las expresas disposiciones de la Carta Orgánica de Puerto Rico o de cualquiera de sus estatutos, el Fiscal General o cualquier fiscal de distrito, ya obrando por su propia iniciativa, ya a instancias de otra persona, podrá radicar ante el Tribunal Supremo de Puerto Rico, una solicitud para que se instruya información de la naturaleza del *Quo Warranto* a nombre de El Pueblo de Puerto Rico; . . .

"Cuando cualquier corporación por sí o a través de cualquier otra entidad subsidiaria o afiliada o agente esté poseyendo ilegalmente, por cualquier título bienes inmuebles en Puerto Rico, El Pueblo de Puerto Rico podrá, a su opción, dentro del propio procedimiento, instar la confiscación de dichos bienes, a su favor, o su enajenación en subasta pública dentro de un término no mayor de seis meses a contar desde la fecha en que se dicte sentencia final.

"En todo caso la enajenación o confiscación se hará previa [mediante] la indemnización correspondiente en la forma establecida en la Ley de Expropiación Forzosa."

"Sección 6.— . . .

"En todos los casos en que quedare satisfactoriamente probado, a juicio de la corte que la corporación o corporaciones, han realizado actos o ejercitado

Se observará que aún El Pueblo de Puerto Rico, al confiscar o vender en pública subasta los bienes de la corporación que ha violado la resolución conjunta antes mencionada, no puede privarla de los bienes sino mediante el pago de la indemnización correspondiente en la forma establecida por la Ley de Expropiación Forzosa. Parece injusto, además, que los demandantes, después de haber obtenido su causante los dos préstamos hipotecarios, retengan el montante de los dos préstamos y recobren las fincas con más los frutos producidos o debidos producir durante el tiempo en que las poseyó la corporación.

A nuestro juicio no cometió error la corte sentenciadora al declarar que, de conformidad con la resolución conjunta y las decisiones de esta corte, la central podía adquirir título válido contra los demandantes.

## II

Cuando a nuestro juicio erró la corte sentenciadora fué al declarar que la sentencia registrada por el secretario

---

derechos no conferidos por la ley, o en contravención a las expresas disposiciones de la misma, en la sentencia que recaiga, se decretará la disolución de la entidad demandada, si fuere doméstica, la prohibición de continuar haciendo negocios en el país, si fuere extranjera, la nulidad de todos los actos y contratos realizados por la corporación o entidad demandada, y se decretará además, la cancelación de' los asientos o inscripciones que los mismos hayan producido en los registros públicos de Puerto Rico, *y cuando el decreto de nulidad afecte a bienes inmuebles y El Pueblo de Puerto Rico, hubiere optado por su confiscación, o se ordenare la venta en pública subasta, la sentencia final fijará el precio razonable que deba pagarse por los mismos. A estos efectos deberá fijarse el justo valor de los bienes sujetos a enajenación o confiscación en la misma forma fijada en los casos de expropiación forzosa.*

''La infracción de la orden prohibiendo hacer negocios después de dictada sentencia firme será penada con multa máxima de quinientos (500) dólares por cada día que la entidad continuare ejerciendo sus funciones, ejecutable en los bienes de la entidad, y las personas que las representan incurrirán en desacato a la corte castigable con pena mínima de uno a seis meses de cárcel.

''   *   *   *   *   *   *   *   *

''A los fines de fijar el valor de los bienes El Pueblo de Puerto Rico, por conducto de sus agentes o representantes, queda autorizado para penetrar en las fincas o bienes objeto de controversia cualquiera que sea su naturaleza y condición.'' (Bastardillas nuestras.)

en el caso 8597 era nula por infringirse en el emplazamiento el inciso 4 del artículo 89 del Código de Enjuiciamiento Civil.

El emplazamiento que se expidió en el pleito 8597, en lo pertinente dice:

"Por la presente se notifica a ustedes que se ha presentado en la oficina del secretario de la Corte de Distrito de Arecibo del Distrito Judicial de Arecibo, Puerto Rico, la demanda del actor antes citado, en la cual solicita de la corte dicte sentencia condenando a los demandados al pago de $56,574.07, importe total de dos préstamos con sus intereses convenidos, a saber: uno por $25,000 hecho por la demandante a Fernando González Cabeza y esposa Elisa Campos por escritura 45 de 14 de abril de 1920, ante el notario Santiago B. Palmer, para ser pagado con interés del ocho por ciento anual, en término de 5 años, divididos en cinco plazos iguales, vencederos cada uno en los días 30 de julio de los años 1921 hasta el 1925 inclusive; y el otro por $14,000, hecho por la misma demandante a los mismos González Cabeza y su esposa Elisa Campos, por escritura número 5 otorgada en Arecibo el 22 de mayo de 1920, ante el notario Agraít, cuya cantidad se obligaron a pagar en seis años, con intereses al 9 por ciento anual, vencederos en esta forma: $2,000 el 22 de mayo de 1921, y $2,400 en cada uno de los días 22 de mayo de los años 1922, 1923, 1924, 1925 y 1926. Se estipuló en el primer préstamo que vencidos dos plazos de capital o dos anualidades de intereses, sin pagarse, vencería toda la deuda y sería exigible la misma y en el segundo fué convenido que si se dejaban de satisfacer dos plazos consecutivos de capital e intereses se entendería vencida toda la deuda y sería exigible. Los demandados han pagado solamente $628.99. Se pide también a la corte condene a los demandados al pago de sus intereses hasta el día de su pago al tipo convenido, condenándolos así mismo a pagar las costas, gastos y honorarios de abogado. Es abogado de la demandante el Sr. José R. Aponte, con oficina en la calle Dr. Coll y Toste Núm. 2 de Arecibo, P. R.

"Y se notifica a ustedes que de no comparecer a contestar dicha demanda dentro de los diez días de notificados, si la notificación se hiciere en el distrito, y dentro de los veinte si se hiciere fuera del distrito, pero en la Isla de Puerto Rico, y dentro de los cuarenta días si se hiciere en otra parte, *la demandante podrá obtener una sentencia de acuerdo con lo solicitado en la demanda.*" (Bastardillas nuestras.)

Como podrá verse de su texto, el emplazamiento suministró toda la información necesaria para que el secretario pudiera registrar la sentencia al no comparecer los demandados. En el emplazamiento se consigna en total la cantidad reclamada, $56,574.07, y en detalle los factores que la componen. El único defecto que contiene es que en su último párrafo anteriormente transcrito el secretario no repitió la cantidad por la cual la demandante obtendría sentencia en caso de que los demandados no comparecieran, limitándose a decir que "la demandante podrá obtener una sentencia de acuerdo con lo solicitado en la demanda." Ni siquiera tenía que hacer el secretario un cálculo aritmético para determinar el montante de la sentencia, pues como hemos indicado la cantidad reclamada aparecía expuesta al principio del emplazamiento.

En el caso de *Freiría & Co.* v. *R. Félix Hermanos & Co.*, 20 D.P.R. 159, la mercantil Freiría y Cía., S. en C., demandó a R. Félix Hermanos y Cía. en cobro de la cantidad de $1,245.15. La sociedad demandada fué emplazada en Caguas el 15 de febrero de 1909 en la persona de Román Félix Aponte, su único gestor. La parte demandada no radicó contestación y la demandante solicitó que se anotara su rebeldía y se registrara sentencia en su contra. El 3 de marzo de 1909 se anotó la rebeldía y se registró la sentencia, condenando a la sociedad demandada a pagar a la demandante la suma por ésta reclamada. El 27 de mayo de 1909 se expidió mandamiento de ejecución, y el 10 de septiembre de 1910 el márshal de la Corte de Distrito de Humacao lo cumplimentó embargando ciertas propiedades del demandado Román Félix, a quien notificó el embargo. El 28 de junio de 1912 se celebró la subasta de los bienes embargados, siendo adjudicados a la demandante. El 15 de abril de 1913 compareció en el pleito la demandada "solamente a los efectos de pedir la nulidad del emplazamiento expedido" por el fundamento de no contener el requerimiento que ordena la

ley, ý oídas ambas partes la corte, por resolución de 19 de abril de 1913 declaró nulo el emplazamiento y las actuaciones posteriores. Notificada la resolución el 12 de mayo de 1913 al abogado de la demandante, éste al día siguiente interpuso recurso de apelación. Este tribunal, por voz de su entonces Juez Asociado señor Del Toro, revocó la orden apelada y desestimó la solicitud del demandado. Luego de hacer un estudio de la jurisprudencia de esta corte y de la de California, se expresó así:

"Una inspección del legajo de la sentencia en este caso muestra el defecto que hemos apuntado, esto es, que el emplazamiento no cumple literalmente con la ley, pero no muestra que la corte de distrito dejara de adquirir jurisdicción sobre la persona del demandado. Este fué en realidad de verdad emplazado personalmente y notificado de las pretensiones del demandante, de su obligación de comparecer ante una determinada corte dentro de un plazo fijado y de lo que podía ocurrirle si no comparecía. Al hacérsele esta última advertencia no se cumplió estrictamente con la ley, mas como el demandado no pidió a la corte de distrito dentro del término en que se dictó la sentencia o dentro del plazo de seis meses que fija el artículo 140 del Código de Enjuiciamiento Civil, que dejara sin efecto la sentencia, y, personalmente notificado en septiembre de 1910 del embargo trabado en la ejecución de la sentencia, tampoco, dentro de un período razonable, pidió que se le eximiera de los efectos de la sentencia, es necesario concluir que la solicitud del demandado hecha el 15 de abril de 1913, se presentó demasiado tarde para que pueda prosperar en una corte de justicia.

" 'Cuando una sentencia es enteramente nula por falta de jurisdicción, el poder de la corte para dejarla sin efecto no está limitado al término en el cual se dictó, sino que puede ejercerse en un término posterior. Y esto se aplica lo mismo cuando la falta de jurisdicción es por razón de la materia que por razón de las partes. Pero esta regla no se aplica a meros errores e irregularidades; y defectos e irregularidades con respecto a la jurisdicción que hagan la sentencia anulable a lo sumo, no pueden servir de fundamento para anular la sentencia en un término posterior, especialmente cuando ha sido consentida por las partes por un considerable período de tiempo.' 23 Cyc., 905 y 906 y autoridades citadas.

"'Una parte que tiene conocimiento de una sentencia dictada en contra suya debe ejercer diligencia razonable en procurar que se deje sin efecto, y su dilación inexcusable en hacer la solicitud, siendo igual a negligencia, será motivo bastante para que la corte rehuse conceder el remedio solicitado, especialmente cuando el dejar sin efecto la sentencia causaría molestias no usuales a la parte contraria, o cuando están envueltos derechos de terceros.' 23 Cyc., 909 y 910 y autoridades citadas.

"En el caso de *Bronson* v. *Schulten,* 104 U. S. 410, en el cual la Corte Suprema de los Estados Unidos revocó una sentencia dictada por la Corte de Circuito de los Estados Unidos del Distrito Sur de Nueva York, por virtud de la cual la dicha corte de circuito anuló una sentencia que había pronunciado hacía diecisiete años, después de un cuidadoso estudio de las facultades de las cortes de justicia en caso de tal naturaleza, dice la corte: 'También es un principio de equidad de los que más se alegan, que deberá la parte que trata de obtener un remedio en un caso como el presente, emplear la debida diligencia en ejercitar sus derechos, y que tanto la negligencia como el abandono en tal respecto, constituyen iguales obstáculos para el ejercicio del remedio.' "

En el caso de *Ramos* v. *Sellés Casas & Co.,* 37 D.P.R. 604, que era un pleito en cobro de dinero, Santiago Iglesias Silva fué incluído como demandado. Fué emplazado y no compareció, dictándose sentencia en su contra. Apeló de la sentencia y alegó la nulidad del emplazamiento, fundándose en que sólo lo apercibía de que de no comparecer "podrá [el demandante] obtener una sentencia de acuerdo con la súplica de la demanda." Este tribunal revocó la sentencia en cuanto a Iglesias porque el emplazamiento no se ajustaba al estatuto. Como podrá verse, el caso de *Ramos* se distingue del de autos en que allí Iglesias apeló inmediatamente de la sentencia dictada en su contra, señalando como motivo de error la nulidad del emplazamiento.

En el caso de *Martínez* v. *Figueroa,* 50 D.P.R. 951, se trataba de un pleito de desahucio en el cual se planteó la nulidad de la sentencia del pleito en cobro de dinero contra el causante de los posteriormente demandados en el caso de desahucio, por la cual sentencia derivó su título el deman-

dante. En el pleito en cobro de dinero el emplazamiento no especificó la suma por la cual se dictaría sentencia en caso de no comparecer el demandado. Se exponía en el emplazamiento que se habían pactado honorarios de abogado, sin especificar su importe, y el secretario dictó sentencia en rebeldía no obstante tratarse de una cantidad que no era líquida. Se resolvió por este Tribunal que la sentencia dictada en rebeldía era nula.

En el caso de autos ya hemos visto que el emplazamiento especificaba la cantidad reclamada en la demanda, si bien al final del mismo no la repetía, limitándose a expresar que en caso de no comparecer los demandados, la demandante obtendría sentencia de acuerdo con lo solicitado en la demanda. El emplazamiento en el pleito seguido por la central contra los ahora demandantes fué expedido el 18 de diciembre de 1925, y diligenciado por el márshal tres días después. La sentencia en rebeldía fué registrada el 1 de febrero de 1926. La nulidad del emplazamiento se viene a pedir alrededor de dieciséis años después que se registró la sentencia en rebeldía. A nuestro juicio es de perfecta aplicación el caso de *Freiría & Co.* v. *R. Félix Hermanos & Co.,* supra.

El error que sufrió el secretario con respecto a los intereses, tanto al registrar la sentencia en rebeldía como al expedir el mandamiento de ejecución, no invalida el procedimiento. Lo sucedido con respecto a los intereses es lo que los romanos denominaban *plus petitio,* es decir, el defecto en que incurría el demandante cuando en su demanda reclamaba más de lo que realmente le adeudaba el demandado.[6] En el derecho romano prevalecía la regla al efecto de que cuando el demandante dolosamente reclamaba una cantidad mayor que la que se le adeudaba, no sólo no podía obtener la cantidad que en exceso reclamaba, si que perdía lo que realmente le adeudaba el demandado. Este principio del derecho

---

([6]) Plus petición incluía la acción de pedir más de lo debido, en el tiempo, en el modo o en el lugar, o en la cantidad como en el presente caso.

romano fué incorporado en las Leyes 42, 43, 44 y 45 del Título II de la Partida Tercera. Se observará que aún en el derecho antiguo, para que la reclamación de una cantidad mayor que la adeudada perjudicase al demandante, era preciso que éste al así reclamarla lo hiciese dolosamente. Ese principio de ley en el vigente derecho español no tiene el alcance que tenía en el antiguo. En España en la actualidad, como se dice en el tomo XXI de la Enciclopedia Jurídica Española, pág. 831, la plus petición es una excepción perentoria que se puede oponer a la demanda para reducirla a sus justos límites, y la única pena que apareja si se demuestra que el demandante se excedió voluntaria y conscientemente en su reclamación, es la condena de costas como sanción de su temeridad. En Puerto Rico, no tratándose de un pleito sobre cobro de hipoteca por el procedimiento ejecutivo sumario, al apelarse de la sentencia que concede más intereses que los convenidos, lo que procede no es ni siquiera su revocación, sino su modificación para ajustarla a sus justos límites, según se resolvió por este tribunal en el caso de *Muñoz* v. *Nieves,* 53 D.P.R. 349.[7]

■ Y por último, el hecho de que en la orden de ejecución en el referido pleito 8597 no se hubiere requerido al márshal que hiciera efectivo el fallo en la propiedad personal de los deudores y si ésta no fuere suficiente en la propiedad inmueble perteneciente a los mismos, conforme dispone el inciso 1 del artículo 240 del Código de Enjuiciamiento Civil, no afecta la validez de la sentencia porque según consta de los autos, sin ser controvertido por los demandantes, en el acto de la subasta compareció el abogado Lens Cuena a nombre de los ahora demandantes y solicitó que por entenderlo beneficioso para sus clientes, se vendieran los bienes inmuebles globalmente y no por fincas separadas. A nuestro juicio, esa irregularidad en una orden de ejecución que hace tantos años

---

(7) En California impera la misma doctrina. *Shirran* v. *Dallas,* 132 Pac. 454, y *Hunt* v. *Loucks,* 38 Cal. 372.

fué expedida y diligenciada, además de haber sido alegada tardíamente, quedó subsanada por la actuación del abogado en representación de los entonces demandados.

### III

■ La conclusión a que hemos llegado respecto a la validez del título de la central sobre los bienes inmuebles nos releva de determinar si la escritura de 26 de agosto de 1927 tuvo el efecto de ratificar dicho título.

En lo que a la venta de los bienes muebles respecta, es indudable que la viuda y los hijos entonces mayores de edad transmitieron a Oliver, Matienzo & Co., S. en C., un título válido que la sociedad a su vez traspasó a la central. Pero como al venderse los bienes muebles José Antonio González Campos era menor de edad y en ningún momento se obtuvo la correspondiente autorización judicial, debemos determinar si en lo que a él se refiere hubo ratificación respecto a la venta de los bienes muebles. Ya hemos visto que los $2,062.50 que le correspondieron por concepto de la venta de los bienes muebles fueron depositados en el banco a nombre de su madre y del fiscal de distrito; que previa autorización judicial, de esa suma se invirtieron dos mil dólares en una hipoteca, que ésta fué más tarde cancelada y su importe invertido en una casa a nombre del menor; y por último que siendo ya José Antonio González Campos mayor de edad, constituyó hipoteca sobre esa casa en garantía de un préstamo de quinientos dólares que recibió de Domingo Toledo. En tales circunstancias, no podemos convenir con la corte sentenciadora en que esta conducta por parte de José Antonio González Campos no constituye una ratificación de la venta de su participación en los bienes muebles. La hipoteca por él constituída equivalió a la confirmación tácita a que se refiere el artículo 1263 del Código Civil.

*Procede, por lo expuesto, confirmar la sentencia en cuanto declaró sin lugar la demanda en lo que respecta a los deman-*

*dantes Elisa Campos Delgado y Juana María de los Ange-
les y Fernando González Campos, y revocarla en cuanto de-
claró con lugar la demanda en lo que a José Antonio Gon-
zález Campos se refiere; y en su consecuencia dictar la sen-
tencia que debió dictar la corte inferior, es decir, declarar
sin lugar la demanda con costas a los demandantes.*

El Juez Asociado Sr. Snyder no intervino.